David HERRON, Appellant,

v.

Charles T. BARNARD, et al., Respondents.

No. WD 74910.

Missouri Court of Appeals, Western District.

Jan. 29, 2013.

Donald P. Herron, Shawnee Mission, KS, for appellant.

David A. Jermann, Kansas City, MO, for respondents.

Before Division Two: Lisa White Hardwick, Presiding Judge, and James M. Smart, Jr., and Karen King Mitchell, Judges.

KAREN KING MITCHELL, Judge.

David Herron appeals the judgment of the trial court denying, after a bench trial, his claims for conversion and replevin of various items of personal property that he had placed in office space leased from Charles Barnard by Herron's employer. Herron raises three claims on appeal, all arguing that the trial court's judgment was against the weight of the evidence. First, he argues that the evidence established meritorious claims for conversion and replevin of the property at issue. Second, he argues that Barnard failed to meet his burden to prove that the items at issue constituted fixtures, thereby becoming part of the leasehold to which Barnard was entitled. And third, he argues that Barnard failed to prove that Herron abandoned any of these items. Based upon our standard of review and the law as to which party bears the burden of proof on the various claims, we find that the trial court's judgment as to all of the items except the door and transom was not supported by substantial evidence. There-fore, we affirm the trial court's judgment regarding the door and transom, but we reverse its judgment and remand for further proceedings as to the remainder of the property in dispute.

## Factual Background

On March 1, 2007, Barnard, acting on behalf of Baltimore Avenue Investors, LLC (collectively "Barnard"), executed a written lease agreement for a 1,442–square–foot office space at 2000 Baltimore Avenue in Kansas City, Missouri, with Boka Powell, LLC, a Texas-based architectural design firm. Herron was employed by Boka Powell to run the Kansas City office.

### The Lease

The lease agreement was for a two-year term with a monthly rent payment of $1,562.17 and a right of first refusal regarding the lease of additional space within the building. The parties further agreed that Boka Powell, through Herron and at its own expense, would be permitted to remove existing partitions in order to reconfigure space for a kitchenette; relocate the plumbing, electrical, and waste lines for this purpose; add carpet; relocate the entry door; and paint the walls and ceiling. The lease further provided that Boka Powell was responsible for putting in a security system at its own expense. The space was then remodeled in accordance with the agreed-upon terms.

After the space was remodeled, Herron arranged for the installation of a sink, cabinetry (including a pull-out waste receptacle and storage bin), appliances, and shelving in the kitchenette area; he also arranged for the installation of a custom-made, tempered-glass door and matching transom for the entrance, as well as a variety of new light fixtures and bulbs, a picture-hanging mechanism, filing cabi-

nets, and a security system. Of these items, Herron, himself, purchased the appliances, the sink, the bookshelves, the door and transom, the picture hanger, all of the lighting, the wire storage bin, and the wastebasket. Boka Powell purchased the filing cabinets, the storage cabinets, and the security system, but later transferred ownership of these items to Herron as part of a separation agreement. Herron later testified that the particular items he selected were for the purpose of creating an architectural showpiece for his customers to demonstrate what the architectural firm could do with a space.

### Installation of the Property

The bookshelves were placed on an existing wall in the space in a manner that covered a freight elevator door, rendering it unusable so long as the shelving remained in the space.[1] The shelving itself was affixed to the back wall pursuant to building codes, but it was attached by a "French cleat," which is a method of attachment whereby the shelving is attached to spacers on the wall, as opposed to being directly attached to the wall; this method is designed specifically to foster easy removal of the shelving from the wall, leaving minimal or no damage. The shelving was also attached on both ends to the newly constructed side walls by sixteen six-inch-long screws.

The wood cabinets above and below the sink were affixed to the opposite side of the kitchenette on the newly constructed wall, also using the "French cleat" method to foster easy removal with minimal or no damage to the wall. The matching refrigerator and dishwasher were plugged into electrical outlets in the newly constructed

wall in the spaces made available by the wood cabinetry. Both were also attached to a water line, and the dishwasher was further attached to a waste line to accommodate the garbage disposal. The sink faucet was a "high design architectural faucet" that cost approximately $1,800.00. It could be easily replaced by any other faucet for approximately $50.00. Within the wood cabinetry, there were two doors; one housed the wastebasket and the other housed the wire storage bin.

The filing cabinets adjacent to the sink, appliances, and other cabinetry were not attached to the wall in any manner; instead, they were held in place by gravity alone, and they were attached to one another with tape.

On the opposite side of the newly constructed wall, on the exterior of the kitchenette, was a 48–foot track with suspended wires used to hang pictures and display local artwork. It would not have caused any damage to the structure if removed. In fact, the wall was constructed, in accordance with building codes, to be completely self-sufficient, meaning that it would not be harmed by removal of anything that was attached to it.

Herron replaced the bulbs in some existing track lighting with special light bulbs to give the space more of a "daylight" feel. He also added accent lighting that merely sat atop the bookshelves, but was hardwired into the building in order to comply with building codes.

Herron also installed a custom tempered-glass door and matching transom (with a total height of approximately 14 feet), given to him by the glass manufacturer. The door was attached by two

---

1. The parties offered contradictory testimony at trial regarding the installation of the shelving. Herron testified that Barnard, when discussing the construction renovations, "insisted that [Herron] could not leave anything permanent in front of the door." Barnard, however, testified that his approval of the remodel design was not conditioned upon any requirement that the bookshelves be removable.

hinges. The transom sat inside wooden pockets built into the drywall surrounding it. Removing the transom would have caused significant damage.

When Boka Powell first moved into the building, there was no security system, and by the terms of the lease agreement, Boka Powell was to provide its own security system at its own expense. Boka Powell purchased a wireless system from ADT, consisting of glass breakage sensors and a movement sensor, all taped to the space. Removing this system would not have caused any damage.

**Termination of the Lease and Advent of the Property Dispute**

Before the original two-year term expired, Boka Powell agreed to renew the lease. Barnard offered two options: the first was a two-year extension with an increased rent based upon an increase in the square footage of the space from renovations, and the second was a one-year extension at the same increased rental rate with the option for an additional extension of one year at an even higher rental rate. Although Herron was hoping for the two-year extension, Boka Powell opted for the one-year extension with the one-year renewal option. When Herron conveyed Boka Powell's request to Barnard, Herron also told Barnard, "If at the end of the next year they decide to no longer participate or I have enough work to continue with my own company, I hope that we can still work out a future long term agreement." The term of the renewed lease was set to expire on April 30, 2010.

Sometime in November 2009, Boka Powell decided to cancel the lease agreement.

Boka Powell paid, in a lump sum, the rent due through April 30, 2010, but terminated its lease as of January 30, 2010, advising Herron to vacate the premises no later than January 29th. In a separation agreement between Boka Powell and Herron, Boka Powell agreed to compensate Herron for outstanding expenses by giving him eight workstations, eight chairs, eight file cabinets, eight conference chairs, and two "L file" cabinets that were, at the time, located in the leased space, with those items to be removed at Herron's expense.

Herron and Barnard discussed the possibility of Herron leaving his property in the space after January 30th while Herron searched for a co-tenant to help him take over the lease. Although the evidence reflects different understandings of what Herron's "property" consisted of, it was undisputed that property belonging to Herron remained on the premises with Barnard's permission.[2]

On February 24, 2010, Herron advised Barnard that he was unable to secure a co-tenant and could not afford the rent on his own. Herron indicated that, although the original lease expired on April 30, 2010, he could make arrangements to move his property before then, and he requested that Barnard identify what he considered a reasonable move-out date. In response, Barnard simply suggested that they meet up the next week but provided no move-out date. At that meeting, Herron returned his keys, but Barnard indicated that if Herron needed back in the space, all he needed to do was contact Barnard, and Barnard would let him in.[3]

---

**2.** Barnard testified that his understanding was that the "property" consisted of only a table and chairs. Herron testified that his "property" consisted of all of the items in dispute in addition to items Barnard ultimate-

ly allowed him to remove, such as his books, papers, files, a table, and chairs.

**3.** The evidence reflects that Herron still had access to the building through the security

There was no communication between Herron and Barnard during the month of March, and Barnard took no steps to terminate the permission he had granted to Herron to leave property on the premises. Herron arranged to remove his property on April 29th. While Herron (along with a small crew of workers) was in the process of removing the various items at issue in this appeal, Barnard showed up and advised Herron and his crew to stop what they were doing and leave because they were not authorized to be there, and Barnard considered them to be trespassing.

Thereafter, Herron filed a lawsuit for conversion and replevin (among other claims), alternatively seeking return of the property or damages. Barnard filed an answer and an amended answer, raising, as affirmative defenses, claims that he owned the property because: (1) the property constituted fixtures that transferred to Barnard pursuant to the terms of the lease agreement; and (2) Herron had abandoned the property by leaving it on the premises beyond the expiration of the lease. The trial court, after hearing testimony from both Herron and Barnard, and after viewing numerous exhibits consisting of photographs, blueprints, emails, and contracts, denied all of Herron's claims. Neither party requested findings of fact or conclusions of law, and, accordingly, the trial court provided none. Herron appealed the judgment.

## Standard of Review

"We review court-tried cases according to the standard set forth in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)." *Golden Rule Ins. Co. v. R.S.,* 368 S.W.3d 327, 334 (Mo.App. W.D.2012). According to this standard, reversal is warranted where the trial court's judgment is "not supported by substantial evidence, it

is against the weight of the evidence, it misstates the law, or it misapplies the law." *Id.*

## Analysis

Herron raises three claims of error on appeal, all arguing that the *Murphy v. Carron* standard of review requires reversal in this case. We agree in part.

### A. The Burden of Proof

"The application of th[e *Murphy v. Carron* ] standard of review varies depending on the burden of proof applicable at trial and the error claimed on appeal to challenge the judgment." *Pearson v. Koster,* 367 S.W.3d 36, 43 (Mo. banc 2012). "The reviewing court cannot review the judgment of a trial court properly under a given standard of review without considering the burden of proof governing the trial court's determination." *Id.*

In order to decide this case, we must first examine which party bore the burden of proof on each issue before the trial court. There were three main issues before the court: (1) whether the elements of conversion and replevin were established; (2) whether the property at issue constituted fixtures; and (3) whether Herron abandoned the property at issue.

### 1. Conversion and Replevin

■■■ " 'Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights.' " *Hunt v. Estate of Hunt,* 348 S.W.3d 103, 113 (Mo. App. W.D.2011) (quoting *Amond v. Ron York & Sons Towing,* 302 S.W.3d 708, 712 (Mo.App. E.D.2009)). "Replevin is a possessory action to obtain property that is in the defendant's possession." *Lafayette v. Courtney,* 189 S.W.3d 207, 210 (Mo.App.

---

system with a key card or security code that

he acquired from the system provider.

W.D.2006). "Both conversion and replevin require proof of the same three elements...." *Id.* Those elements are: (1) the plaintiff "owned the property or was entitled to possess it; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession." *Hunt,* 348 S.W.3d at 113. "It is a plaintiff's burden to 'prove his right to immediate possession of the property at the time suit was filed, and that defendant was then wrongfully detaining the same.'" *Green v. Study,* 286 S.W.3d 236, 240 (Mo.App. S.D. 2009) (quoting *Ferrell Mobile Homes, Inc. v. Holloway,* 954 S.W.2d 712, 714 (Mo.App. S.D.1997)).

Thus, Herron bore the burden of proving that he owned the property at issue, that Barnard took possession of it with the intent to exercise control over it, and that Barnard thereby deprived Herron of his right to possess the property.

### 2. Fixtures

■ "'A fixture is an article of the nature of personal property [that] has been so annexed to the realty that it is regarded as part of the land and partakes of legal incidents of the freehold and belongs to the person owning the land.'" *Bastas v. McCurdy,* 266 S.W.2d 49, 51 (Mo.App.1954). "The elements of a fixture are annexation, adaptability and intent." *Blackwell Printing Co. v. Blackwell–Wielandy Co.,* 440 S.W.2d 433, 438 (Mo.1969). "Each of the elements ... must be present to some degree, however slight." *Wisdom v. Rollins,* 664 S.W.2d 37, 39 (Mo.App. S.D.1984). And "the general rule is that the burden of showing that the circumstances of the annexation are such as to make an article a fixture is on the party asserting it to be one." *Id.*

Here, Barnard pled, as an affirmative defense, that the items at issue constituted fixtures, meaning that, once they became fixtures, they were no longer Herron's property, but instead belonged to Barnard. Consequently, it was Barnard's burden to prove the existence of all three elements of a fixture with respect to each individual item at issue.

### 3. Abandonment

■ "Abandonment, in law, is the relinquishment or surrender of rights or property by one person to another...." *Gale v. Nolan,* 137 S.W.2d 974, 976 (Mo. App.1940). "Abandonment consists of two elements: (1) an intent to abandon, and (2) the external act by which the intention is carried into effect." *Hoffman Mgmt. Corp. v. SLC of N. Am., Inc.,* 800 S.W.2d 755, 762 (Mo.App. W.D.1990). "There must be the concurrence of the intention to abandon and the actual relinquishment of the property." *Gale,* 137 S.W.2d at 976.

■ "Abandonment must be proven by the party relying on it[,] and ... [t]he evidence to support the claim of abandonment must be clear, unequivocal and decisive." *Hoffman,* 800 S.W.2d at 762.

Here, Barnard also pled, as an affirmative defense, that Herron abandoned the property at issue. Thus, Barnard bore the burden of proving—through clear, unequivocal, and decisive evidence—that Herron both intended to abandon the property and engaged in some external act evidencing that intent.

### B. Application of the *Murphy v. Carron* Standard

"In addition to the burden of proof, the reviewing court also must apply the proper standard of review for the error claimed on appeal." *Pearson,* 367 S.W.3d at 43. "A claim that there is no substantial evidence to support the judgment or that the

judgment is against the weight of the evidence necessarily involves review of the trial court's factual determinations." *Id.* "A court will overturn a trial court's judgment under these fact-based standards of review only when the court has a firm belief that the judgment is wrong." *Id.*

"A claim that the judgment erroneously declares or applies the law, on the other hand, involves review of the propriety of the trial court's construction and application of the law." *Id.* "Implicit in these standards is the recognition that the trial court, in reaching its judgment, is in a better position to determine factual issues than an appellate court reviewing only the record on appeal." *Id.* "In this regard, it is necessary for the reviewing court to treat differently questions of law and questions of fact." *Id.*

Questions of law arising in court-tried cases are reviewed *de novo*. *Id.* In reviewing questions of fact, however, we "defer to the trial court's assessment of the evidence if any facts *relevant to an issue* are contested." *Id.* at 44 (emphasis added).

When a claim of error on appeal presents a mixed question of law and fact, "the reviewing court applies the same principles articulated above except that it is necessary to segregate the parts of the issue that are dependent on factual determinations from those that are dependent on legal determinations." *Id.* " '[W]hen presented with an issue of mixed questions of law and fact, a [reviewing court] will defer to the factual findings made by the trial court so long as they are supported by competent, substantial evidence, but will review de novo the application of the law to those facts.' " *Id.* (quoting 5 Am.Jur.2d *Appellate Review* § 631 (2012)).

▆▆▆▆ "[P]arties who desire to know how the trial court sorted out these mixed questions of fact and law have the ability to request written findings of fact." *Id.* at 45 n. 3. In this case, the trial court's judgment contained no findings of fact or conclusions of law; thus, we must rely upon two legal assumptions. As for the factual determinations, in the absence of express findings, we are to view the contested facts as "having been found in accordance with the judgment." *Id.* (citing Rule 73.01(c)). And as for the application of the law, "[t]he trial court is presumed to know the law." *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 822 (Mo. banc 2011).

Thus, in reviewing Herron's claims in this case, we assume that the trial court applied the correct rules of law and found all contested facts in Barnard's favor. Given these assumptions, the only question before us is whether the facts, viewed in the light most favorable to Barnard, supported the trial court's judgment under the applicable rules of law.

## C. The trial court's judgment in Barnard's favor was not supported by substantial evidence.

With all of the applicable burdens of proof, standards of review, and required assumptions in mind, we turn now to the propriety of the trial court's judgment in Barnard's favor. And upon detailed review, we find, for the following reasons, that the trial court erred in denying Herron's claims of conversion and replevin regarding all of the property except for the door and transom. As for those items, the trial court's judgment is affirmed because substantial evidence supported a determination that the door and transom constituted fixtures.

## 1. Based upon the uncontested evidence presented at trial, Herron met his burden of establishing the elements of conversion and/or replevin.

As noted above, in order to meet his burden of proving conversion and/or re-

plevin, Herron had to establish that he owned the property or was entitled to possess it, that Barnard took possession of the property with the intent to exercise some control over it, and that Barnard thereby deprived Herron of his right to possession. *See Hunt,* 348 S.W.3d at 113.

"When the burden of proof is placed on a party for a claim that is denied, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence." *White v. Dir. of Revenue,* 321 S.W.3d 298, 305 (Mo. banc 2010). "[W]hen the evidence is *uncontested* [, however,] . . . no deference is due to the trial court's findings . . . [because t]hen, the issue is legal and there is no finding of fact to which to defer."[4] *Id.* at 307.

■ The evidence on these elements was uncontested. The entire focus of the case was whether the items at issue constituted fixtures, and, therefore, belonged to Barnard at the time of the alleged conversion. Barnard did not challenge the facts presented by Herron that Herron either purchased (and therefore owned) the items at issue, or that they were given to Herron by Boka Powell as compensation under a separation agreement. Barnard admitted that he did not purchase any of the items at issue, and that all of them were brought onto the property by either Boka Powell or Herron. Barnard admitted exercising control over the items by refusing to allow Herron to remove them from the property when Herron attempted to do so based upon Barnard's belief that the items constituted fixtures, and that ownership was thereby transferred to him as the landowner. And, in refusing to allow Herron to remove the items, Barnard thereby interfered with Herron's right to possession of the items.

Given that the evidence on these elements was uncontested, the only question before us is one of law—whether the facts presented supported Herron's claims of conversion and replevin. Because the uncontested evidence supported each of the elements Herron was required to prove, we find that, as a matter of law, Herron proved his claims of conversion and replevin. Thus, we turn now to the question of whether there was substantial evidence, under the law applicable to either fixtures or abandonment, to support the trial court's judgment in favor of Barnard.

**2. Barnard failed to meet his burden of establishing that the items, with the exception of the door and transom, constituted fixtures.**

As noted above, by asserting that the items at issue constituted fixtures, Barnard assumed the burden of proving that each item met each of the required elements of annexation, adaptation, and intent, so as to constitute fixtures and render Barnard the true owner of the items.

■ "Whether or not an article is a fixture depends upon the facts and circumstances of a particular case." *Hoffman,* 800 S.W.2d at 759–60. As previously noted, "[e]ach of the elements . . . must be present to some degree, however slight." *Wisdom,* 664 S.W.2d at 39. Thus, if there is not substantial evidence to support any one of the three elements, Barnard failed to meet his burden of establishing that the disputed items constituted fixtures.

**a. The elements of a fixture**

■ The annexation element refers to the physical attachment of the property to the realty, and where structures are

---

4. "[T]he concept of 'contested evidence[,]' [as opposed to 'contradicted evidence,' means] . . . disputing or litigating a claim without

requiring an affirmative offer of evidence contradicting the [burden-carrying party's] evidence." *White,* 321 S.W.3d at 307 n. 7.

removable with minimal or no damage resulting, the mere fact of annexation does not support a finding that the item was a fixture. *See Blackwell,* 440 S.W.2d at 438; *Matz v. Miami Club Restaurant,* 127 S.W.2d 738, 742 (Mo.App.1939). On the other hand, "[a]nnexation that may be slight and easily displaced does not prevent an article from becoming a fixture when the other elements are found." *Freeman v. Barrs,* 237 S.W.3d 285, 289 (Mo.App. S.D.2007).

▬ The adaptation element means that "the characteristics of fitness or suitability for the building or premises in question are implied." *State ex rel. State Highway Comm'n. v. Wally Hutter Oil Co.,* 467 S.W.2d 279, 282 (Mo.App.1971). In other words, if the premises were designed or built with the view of having the particular item made an integral part of the building, or if the alleged fixture was necessary for the particular use to which the premises are devoted, the element of adaptation is satisfied. *See Blackwell,* 440 S.W.2d at 438. But, to meet this element, one must prove that the property at issue is "peculiarly adapted to the real property," *Hoffman,* 800 S.W.2d at 760, and "[a]n item usable at other locations is not peculiarly adapted for use on the land in question." *Rothermich v. Union Planters Nat'l Bank,* 10 S.W.3d 610, 617 (Mo.App. E.D.2000). Thus, although a space may be designed for the use of the property in question, unless there is something peculiar or unique about the property itself that requires only that particular item to be used in the space, the element of adaptation is not met. *See id.*

▬ The intent element is "of paramount importance, at least in the case of controversies between ... landlord and tenant, where the controlling question is usually that of whether the intention in annexing the article to the realty was to make it a permanent accession to the land." *Matz,* 127 S.W.2d at 741. "[I]ntention is to be determined as of the time the articles were annexed"; *Wally Hutter,* 467 S.W.2d at 282; and it is the "[i]ntent of the *annexor* at the time of annexation [that] controls as to whether something is to be considered a fixture." *Hoffman,* 800 S.W.2d at 760 (emphasis added). Intent can be determined by the acts and conduct of the annexor, and a court "is not bound by the person's testimony on this point." *Freeman,* 237 S.W.3d at 289.

▬ "When an annexation is made by a tenant and is such that the chattel may be removed without material injury to the realty, there is a presumption that he did not intend to make a permanent annexation to the real estate but intended to reserve to himself the title to the chattel annexed." *In re Estate of Horton,* 606 S.W.2d 792, 795 (Mo.App. S.D.1980). "The law looks with favor upon the right of a tenant to remove articles furnished or installed by him for the purpose of his occupancy even though they may ordinarily be termed fixtures."[5] *Id.*

In the context of commercial tenancies, "[c]ase law appears to support the view

**5.** Herron argues that his status as an employee of the lessee favors a finding that the items at issue did not become fixtures, but instead remained personal property. In response, Barnard argues that Herron was aware of the lease and its terms and, thus, should be held to the same standard as the lessee. Because we hold that the evidence did not support a determination that the items at issue were fixtures, even if the items had been provided by the lessee, we need not address whether a different standard applies when it is an employee of the lessee, rather than the actual lessee, that owns the items. The lease terms are relevant primarily to the issue of what the parties to the lease understood as to whether the items in question were to be treated as fixtures.

that the extent of the furnishings necessary for the operation of a modern business 'negates an intention ... to make any gift to the landlord and that therefore all ordinary store fixtures, including showcases and shelving, business signs, and miscellaneous other appliances installed by (the tenant) may be considered to remain his personal property,' unless 'substantial damage' would be the result of removal." *In re Marla Jean, Inc.*, 25 B.R. 282, 285 (W.D.Mo.1982) (quoting 35 AM.JUR.2D *Fixtures* § 35 and citing several Missouri cases in support).

▆▆ In examining the three elements, "[t]he latter two ..., adaptation and intent, are more important in determining whether a chattel became a fixture than the method by which the chattel is affixed to a freehold." *Freeman*, 237 S.W.3d at 289.

### b. The element of adaptation was not supported by substantial evidence.

As mentioned above, "[e]ach of the elements [of a fixture] ... must be present to some degree, however slight," *Wisdom*, 664 S.W.2d at 39; and the absence of evidence supporting even one of the elements precludes a finding that the items were fixtures.

▆▆ We believe that there was substantial evidence to support adaptation, but only as to the custom door and transom. As for the remaining items, we do not believe that there was substantial evidence to support a finding that Barnard met his burden of demonstrating the element of adaptation.

▆▆ The evidence demonstrated that the door and transom went from floor to ceiling, which was a height of approximately fourteen feet. The transom had to be specially built into the walls by setting it inside a custom-built wooden track and then enclosing and concealing the track within the drywall. Removing the transom would have caused significant damage to the property. It is apparent that the space housing the transom was designed with the view of having that particular transom become an integral part of the building itself. The transom was custom made for the space, and the size of the transom (approximately six feet tall) made it unique.

Although the door, itself, was only minimally attached to the space, it too was custom-built in combination with the transom. The two items were essentially a package set; thus, if the element of adaptation was met as to one of the items, it was satisfied for both. Thus, we believe that the evidence and reasonable inferences supported a finding by the trial court that the element of adaptation was met as to the door and transom.[6]

As to the remaining items, the evidence did not demonstrate that there was anything peculiar or unique about them or that they were somehow made an integral part of the building. In fact, Barnard testified that the picture hanger did not

---

6. We believe that there was substantial evidence to support the elements of annexation and intent, as well, regarding the door and transom. Although Herron stated that his intent was to remove *all* of the items (including the door and transom) upon vacating the space, a court "is not bound by the person's testimony" as to his intent and can, instead, examine his "acts and conduct," as well as "the surrounding facts and circumstances" to

determine his true intent. *Freeman*, 237 S.W.3d at 289. The particular manner of annexation can also serve as evidence of the annexor's intent. And here, the method of annexation of the transom belies Herron's stated intent, and we believe that there was substantial evidence from which the trial court could have found that Herron never intended to remove the transom.

constitute an improvement to the space and that neither the filing cabinets nor the refrigerator were integral parts of the building. And while it is true that the renovations to the space were made with the idea that the new space would be used as a kitchenette and storage, the facts that (1) the bookshelves, appliances, wood cabinetry, wastebasket, storage bin, sink, lighting, and alarm system could have easily been replaced by different bookshelves, appliances, cabinetry, wastebaskets, storage bins, sinks, lighting, and alarm systems, and (2) these particular items could have easily been used at a different location, establishes that these items were not "peculiarly adapted for use on the land in question." *Rothermich,* 10 S.W.3d at 617 (holding that bowling alley pinspotters did *not* constitute fixtures in a bowling alley, in part, because they were easily replaceable by different pinspotters, and the very pinspotters at issue were then currently being used at a different location). Consequently, in the present case, there was not substantial evidence to support a finding that the element of adaptation was met as to any of the items with the exception of the door and transom. And without evidence to support this element, the remaining items could not have constituted fixtures. *Wisdom,* 664 S.W.2d at 39. Thus, any finding by the trial court that the remaining items constituted fixtures was not supported by substantial evidence.

■■■■ In any event, the lease contemplated and provided that "business fixtures" would be removable by the lessee. The term "business fixture" is presumably a synonym for the term "trade fixture." Trade fixtures are:

> "articles or appliances [that] are in some manner or to some degree annexed to or connected with the realty by the tenant for the purpose of carrying on the particular trade or business for which the premises were demised to him by the landlord, but [that], notwithstanding their annexation or connection, do not become a part of the realty, remaining instead the property or chattels of the tenant, removable by him before the expiration of the term of his lease or the period thereafter during which he holds the premises with the landlord's consent."

*Blackwell,* 440 S.W.2d at 438 (quoting *Matz,* 127 S.W.2d at 741). "A distinction is drawn between those articles 'placed in the building for the sole purpose of enabling the tenant to carry on his business' and those 'so placed as to make the building itself peculiarly adapted and more usable for the type of business.'" *Marla Jean,* 25 B.R. at 284 (emphasis omitted) (quoting *Stockton v. Tester,* 273 S.W.2d 783, 787 (Mo.App.1954)). "The former may remain personalty [that] the tenant may remove[, but t]he latter becomes annexed to the realty and must be left behind." *Id.*

■■■■ Here, we believe the evidence demonstrated that the majority of the items at issue constituted trade fixtures, as they were installed in furtherance of the purpose of the lease, which was to provide Boka Powell and Herron with office space to run their architectural design firm.[7] The purpose of the lease was to provide office space, and the installation of nearly all of these items furthered that purpose.[8]

---

7. As discussed elsewhere in the opinion, we do not believe that the law allows Herron to remove the door and transom. Thus, our discussion of "trade fixtures" does not include those items.

8. Barnard's argument is essentially that any item added by a lessee to leased office space that could be used by a future tenant constitutes a fixture that would become the property of the lessor upon termination of the lease. Adopting such an interpretation, however,

*See Marla Jean,* 25 B.R. at 285 (categorizing things such as, " 'all ordinary store fixtures, including showcases and *shelving,* business signs, and miscellaneous other *appliances* ' " as "furnishings necessary for the operation of a modern business" (emphasis added) (quoting 35 Am.Jur.2d *Fixtures* § 35)). Thus, they constituted "trade fixtures" that Herron was permitted to remove at the conclusion of his tenancy pursuant to both the common law and the express term of the lease agreement.

In conclusion, the only items for which substantial evidence supported all three elements required for a finding of fixture status were the door and transom. Thus, to the extent that the trial court's judgment was based upon a finding that these items constituted fixtures, its decision is affirmed.

### 3. Barnard failed to meet his burden of establishing that Herron abandoned any of the property at issue.

In light of the fact that the undisputed evidence and the evidence favorable to Barnard did not substantially support a finding that the property constituted fixtures (with the exception of the door and transom), the next question we must address is whether there was substantial evidence from which the trial court could have found that Herron abandoned the remaining items.

 As discussed, *infra,* to support the trial court's judgment on the abandonment issue, the evidence (both undisputed and favorable to Barnard) had to clearly and unequivocally support a finding that Herron intended to abandon the property and that he engaged in some conduct demonstrating that intent. We hold that there

would effectively eliminate the distinction between fixtures and trade fixtures in the context of leased office space, and perhaps in the

was not substantial evidence to support a finding of abandonment.

 The basis for Barnard's claim of abandonment is that Herron left his property on the premises following expiration of the lease term, and, therefore, he demonstrated his intent to abandon the property. But abandonment "will not be presumed if the conduct of the owner can be explained consistently with a continued claim." *Hoffman,* 800 S.W.2d at 762. "Mere nonuse[ ] does not constitute abandonment." *Russell v. Allen,* 496 S.W.2d 290, 294 (Mo.App.1973). And, generally, trade fixtures are "removable by [the tenant] before the expiration of the term of the lease *or the period thereafter during which he holds the premises with the landlord's consent." Blackwell,* 440 S.W.2d at 438 (emphasis added).

The parties bicker about whether the lease terminated on January 30, 2010, when Boka Powell canceled the lease, or whether it terminated on April 30, 2010, the original termination date through which Boka Powell had paid the rent due. Ultimately, however, it does not matter which date controls. The uncontested evidence demonstrated that there were ongoing discussions between Herron and Barnard about Herron possibly taking over the leased space after Boka Powell terminated its agreement with Barnard. Pursuant to those discussions, Barnard agreed to allow Herron to leave some property on the premises and retain access to the premises. And although the parties disagreed about what that property consisted of, they fully agreed that the permission existed. As it was Barnard's burden to provide clear and unequivocal evidence demonstrating that Herron intended to abandon all of his property, the fact that Herron left his property while under the

context of other business leases as well. Consequently, we are unwilling to adopt Barnard's argument.

belief that he had Barnard's permission to do so, regardless of any miscommunication as to what that property entailed, precludes a finding that Herron intended to abandon any of the property, whether it fell within the scope of the permission or not.

In *Hoffman*, we examined and rejected a similar claim of abandonment to the one Barnard has asserted. In *Hoffman*, the owner of a telephone system, installed in a building that was later sold in a foreclosure sale, asserted a claim for conversion against the purchaser of the building when the purchaser refused to return the phone system following the foreclosure sale. *Hoffman*, 800 S.W.2d at 757–58. The purchaser argued that the owner abandoned the phone system by failing to remove it prior to the foreclosure sale. *Id.* at 762. The trial court rejected the claim, and this Court upheld that decision on appeal. *Id.* The evidence demonstrated that the owner's act of leaving the phone system was not the result of any intent to abandon it, but, rather, was based upon his intent to purchase the building at the foreclosure sale and then continue using the phone system. *Id.* Although the owner did not succeed in his efforts to purchase the building, the fact that he made an effort to do so demonstrated that he never intended to abandon the phone system. *Id.*

Here, the undisputed evidence demonstrated that Herron and Barnard had engaged in ongoing discussions about Herron possibly taking over the leased premises in order to continue running his own architectural business. Consequently, Barnard agreed to allow Herron to leave property in the leased space and retain access to the premises. And "[a]s long as the tenant remains in possession[,] the presumption of abandonment of the fixtures cannot arise." *Blackwell*, 440 S.W.2d at 439.

Herron, however, was unable to find a co-tenant to help pay the rental cost; thus, he was unable to take over the lease. This evidence does not clearly and unequivocally establish that Herron ever intended to abandon the property at issue merely by leaving it on the premises beyond the expiration of the lease term (assuming an expiration date of January 30th). On the contrary, as in *Hoffman*, the evidence is fully consistent with Herron's desire to continue his own business, using his own property, at the premises. Thus, to the extent that the trial court's judgment was based upon a finding of abandonment, it was not supported by substantial evidence.

## Conclusion

Because the parties did not request any findings of fact or conclusions of law, we viewed all contested facts in the light most favorable to Barnard and assumed that the trial court applied the proper law to those facts. But even with those principles in mind, we hold that there was not substantial evidence to support the trial court's judgment in Barnard's favor, except as it applied to the door and transom. Consequently, we reverse the trial court's judgment as to all of the property except the door and transom, and we remand this matter to the trial court in order to determine Herron's remedy (whether it be return of the property, or if damages, what amount of damages to which Herron is entitled). We affirm the trial court's judgment with respect to the door and transom in light of the fact that substantial evidence supported a finding that these items constituted fixtures, thereby transferring ownership of them to Barnard.

LISA WHITE HARDWICK, Presiding Judge, and JAMES M. SMART, JR., Judge, concur.