Michelle GACKI, Appellant,

v.

JEFF KELLY HOMES, INC.,
et al., Respondents.

No. ED 104983

Missouri Court of Appeals,
Eastern District,
DIVISION FOUR.

Filed: October 17, 2017

Motion for Rehearing and/or Transfer
to Supreme Court Denied
December 19, 2017

Gregory R. Futhey, 429 McDonough St., St. Charles, MO 63301, For Plaintiff/Appellant.

Lester J. Hubble, 10024 Office Center Ave. Ste. 203, St. Louis, MO 63128, For Defendants/Respondents.

## OPINION

Colleen Dolan, P.J.

Michelle Gacki ("Gacki") appeals the trial court's grant of summary judgment in favor of Jeff Kelly Homes, Inc., John Jeffrey Kelly, Timely Disbursements, Inc. ("TDI"), John W. Kelly, and Timely Disbursements Pension & Profit Sharing

Trust Fund (the "Fund") (collectively, "Respondents"). Gacki sued Respondents after contracting to purchase a home located in Wentzville, Missouri ("the home") in June 2010 from Jeff Kelly Homes, Inc. After Gacki signed a promissory note and deed of trust (collectively, the "Loan Agreement") and executed a quitclaim deed, which was to be filed only if Gacki fell 30 days or more behind on the loan, she took possession of the home. Shortly thereafter, disputes over payments began and the Fund filed the quitclaim deed and took possession of the home in February 2012. Gacki then filed various counts against Respondents; the Fund was the only respondent to file counterclaims against Gacki. The trial court granted Respondents' and the Fund's motions for summary judgment in their favor on all counts. This appeal follows.

## I. Factual and Procedural Background

Gacki entered into a contract with Jeff Kelly Homes, Inc. on April 28, 2010, to purchase a home located in Wentzville, Missouri for the price of $188,900. Pursuant to that contract, Gacki was directed to seek financing for the home from the Fund, with John W. Kelly acting as the Fund's trustee; however, she was denied a loan for the amount sought due to her poor credit history. Gacki and Jeff Kelly Homes, Inc. then amended the purchase contract to change the price to $176,900 with Gacki paying a $10,000 down payment. After Gacki disclosed to John W. Kelly that she was getting a divorce and was expecting to be awarded around $40,000 from the divorce proceedings, the Fund agreed to issue a loan to Gacki upon certain specific conditions.

First, in addition to monthly payments of $1,254.80 to the fund, Gacki was to pay an additional $40,000 toward the principal balance of the loan ($166,900 after the down payment) upon her divorce being finalized; once this happened, Gacki's monthly payments would be reduced.[1] Additionally, Gacki was to execute a quitclaim deed conveying the home to the Fund, which would only be filed if she fell 30 days or more behind on her loan payments; the alleged purpose of this quitclaim deed was that Gacki would be allowed to avoid a foreclosure judgment and spare her further damage to her credit score if she defaulted on the loan. Gacki was also subject to paying a number of charges and fees if she was late on her monthly loan payments to the Fund. Further, under an acceleration clause, the Fund could declare payment of the full loan balance due if Gacki fell 30 days or more behind on her loan payments.

These conditions were set forth within the Loan Agreement signed by Gacki on June 17, 2010. Those documents also established proceedings similar to a foreclosure that governed the sale of the home if Gacki were to default. The Loan Agreement granted the Fund the "power of sale" as an option if Gacki defaulted, but it did not require the Fund to actually sell the home if Gacki defaulted and the quitclaim deed was filed. The Loan Agreement did require that, if the home was sold by the Fund, the proceeds of the sale must be applied first to the expenses of the sale and then to the remaining balance of the loan. John W. Kelly, acting as trustee of the Fund, claims that he explained the aforementioned terms imposed on Gacki by the Loan Agreement, but she denies this explanation ever took place. Despite

---

1. Gacki's divorce was not finalized until March 18, 2013—well after the trial court proceedings of this case began.

these contentions, Gacki signed the Loan Agreement and executed the quitclaim deed on June 17, 2010, and said quitclaim deed was delivered to John W. Kelly, who placed the deed in a safety deposit box. Gacki resided in the home until February 2011, when she and her husband attempted to reconcile. At that point, Gacki began renting the home out to a business associate, Robert Cooley.

In September 2011, disputes regarding Gacki's monthly payments began arising. Up to that point, automatic ACH payments were successfully withdrawn from Gacki's bank account four times a month (on the first, eighth, fifteenth, and twenty-second of each month) in the amount of $313.70 (equaling $1,254.80 per month). Automatic withdrawals were returned to Gacki's bank account due to insufficient funds once in both September and October of 2011—putting her approximately 15 days behind on her loan payments. In November, Gacki had multiple payments returned to her bank account due to insufficient funds, but these withdrawals were seemingly made by the Fund a day early in each instance (on November 7th instead of the 8th, November 14th instead of the 15th, and November 21st instead of the 22nd), violating the payment terms set by the Fund itself. The Loan Agreement was silent as to this scenario, and it is unclear whether any of these payments should have been deemed "late." Gacki's bank statement from November 2011 indicates that only three payments were actually withdrawn from her account that month—apparently putting her three weeks behind on her loan payments.

After the early withdrawals in November, John W. Kelly, as trustee for the Fund, sent a letter (dated November 30, 2011) to Gacki notifying her that the Fund would no longer be withdrawing the monthly payments by ACH from her bank account and that she would be required to provide the full monthly payment to the Fund by money order or cashier's check by the first of every month beginning December 1, 2011.[2] This letter did not state how much Gacki was behind on her payments, which Gacki claims confused her even more as to the amount that she currently owed. Gacki did not timely make the payment on December 1, 2011 as required by the Fund's letter, but paid $627.40 on December 16, 2011.[3] Again, it is unclear whether this payment should have been considered late, as both the payment terms set by the Fund and the Loan Agreement were silent on the issue of late payments after the Fund had unilaterally changed the payment methods. Assuming the $627.40 payment made to the Fund covered the first two weeks of December, Gacki was still only three weeks behind at that point. There are no records to indicate whether Gacki made any other payments in December 2011. Gacki then made a full month's payment of $1,254.30 on January 3, 2012.

In a letter to Gacki dated January 5, 2012, John W. Kelly stated that Gacki still owed $313.70 from 2011—an amount that was below what she seemingly owed, given that she had missed payments of $313.70 in September, October, and November. After Gacki made no further payments in January 2012, she received another letter from John W. Kelly on January 24, 2012,

---

**2.** Pursuant to the Loan Agreement, the Fund was able to unilaterally "rearrange, adjust, and extend the times and amounts of the payments of interest or principal" without notice to or consent of Gacki.

**3.** The Fund's expectation that Gacki would be able to timely pay the full month's payment on December 1—the very next day after the Fund's own letter was mailed—seems unrealistic, if not impossible. Deeming this payment late seems contrary to the concept of fairness.

this time stating that she was a full month behind on her payments and that she now owed $1,254.80 plus late fees. After receiving this letter, Gacki did not make her required payment on February 1st, but allegedly tendered two checks totaling $1,300 (one for $500 and the other for $800) in February that were never negotiated by the Fund. Gacki also sent a letter to John W. Kelly and the Fund stating her displeasure with the late charges and her intent to catch up on the payments.

John W. Kelly went to the home on February 9, 2012, looking for Gacki. He was told by Robert Cooley that Gacki was not there. John W. Kelly then called Gacki multiple times on February 9th and February 12th; Gacki claims that she answered one of his calls, but alleges that she hung up on him because he was rude. Gacki further claims that after the first call, John W. Kelly began leaving harassing messages. John W. Kelly visited the home again on February 17, 2012 and saw people moving items out. On that same day, John W. Kelly was informed that the home's electricity and gas were scheduled to be shut off. Gacki argues that, at this point, she was in the process of transferring utility service from Robert Cooley's name to hers and that she was about to begin moving back into the home. Gacki further claims that she had informed John W. Kelly and the Fund that she was renting out the home when she began doing so, but John W. Kelly and the Fund deny knowing that Gacki was renting the home to Robert Cooley.

John W. Kelly alleges that, due to his inability to contact Gacki regarding the utilities and seeing Cooley moving out, he believed Gacki had effectively abandoned the property. Under the contract, if Gacki abandoned the property, the Fund could enter and take possession of the home and collect rent payments, including those past due. Believing Gacki had abandoned the

home, John W. Kelly and the Fund took possession of the home sometime prior to February 23, 2012, and changed the locks, despite finding possessions worth thousands of dollars still inside. The Fund also filed the quitclaim deed on February 23, 2012. Gacki went to the home with a locksmith on February 23, 2012, to change the locks, but was met by a Wentzville Police officer who had been informed that the property had been foreclosed upon and prohibited Gacki from entering and changing the locks.

In a February 27, 2012, letter to the Fund, Gacki demanded she be restored possession of the home by February 29, 2012, and that the quitclaim deed be withdrawn. John W. Kelly and the Fund refused to comply and Gacki sued, filing a petition with claims against all Respondents. Specifically, Gacki sued for quiet title against Respondents; for forcible entry and detainer against Jeff Kelly Homes, Inc., TDI, John W. Kelly, and John Jeffrey Kelly; for trespass against Jeff Kelly Homes, Inc., TDI, John W. Kelly, and John Jeffrey Kelly; for slander of title against Respondents; for tortious interference of contract against Jeff Kelly Homes, Inc., TDI, John W. Kelly, and John Jeffrey Kelly; for conspiracy against Respondents; and for violations of the Missouri Merchandising Practices Act against Respondents. In response, the Fund filed its counterclaim petition for judicial foreclosure and liability on the promissory note and for fraud against Gacki and her husband.

After Respondents filed a Statement of Uncontroverted Facts, the trial court granted both Respondents' motion for summary judgment as defendants and the Fund's motion for summary judgment as a counterclaim plaintiff. In its judgments, the trial court specifically ruled that Respondents were authorized to be on the property due to the quitclaim deed that

was properly filed because Gacki was more than 30 days behind on her loan payments and had abandoned the home. The court further ruled that Gacki owed the remaining balance of the loan of $157,893.00, interest in the amount of $64,798.53, and attorney's fees in the amount of $47,173.00. This appeal follows.

## II. Standard of Review

The standard of review for a trial court's decision granting a motion for summary judgment is essentially *de novo. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is appropriate where the moving party has shown there is no genuine issue of material fact and is therefore entitled to judgment as a matter of law. *Wilson v. Union Pac. R.R. Co.,* 509 S.W.3d 862, 869 (Mo. App. E.D. 2017); Rule 74.06(c)(6). "A 'genuine issue' that will prevent summary judgment exists where the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' is real, not merely argumentative, imaginary, or frivolous." *Daugherty v. City of Maryland Heights,* 231 S.W.3d 814, 818 (Mo. banc 2007). We review the record in the light most favorable to the party against whom judgment was entered. *Id.*

A defending party may prevail on a motion for summary judgment by demonstrating (1) facts negating any one of the elements of plaintiff's claim; (2) that after an adequate period for discovery, plaintiff has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one of the elements of plaintiff's claim; or (3) that there is no genuine dispute as to the existence of the facts necessary to support movant's properly pleaded affir-

mative defense. *Wilson,* 509 S.W.3d at 870–71 (citing *Stansbrough v. Vitek Sols., Inc.,* 445 S.W.3d 90, 96–97 (Mo. App. E.D. 2014)). Once the moving party has met this burden, the burden shifts to the non-moving party to identify evidence in the record that directly challenges or contradicts these facts to show that a material fact is genuinely disputed. *Nangle v. Brockman,* 487 S.W.3d 29, 34 (Mo. App. E.D. 2016).

## III. Discussion

Gacki offers eight points on appeal in this case.[4] Gacki argues in a number of these points that the trial court erred by granting Respondents' motions for summary judgment because there were genuine issues of material fact on multiple fronts. We find that there are genuine issues of material fact as to whether Gacki was 30 days or more behind on the loan issued by the Fund and as to whether Gacki abandoned the home. Additionally, we find that the trial court erred in determining that forcible entry and detainer actions may only be brought before associate circuit judges and that it could not hear that cause, and in granting summary judgment in favor of Jeff Kelly Homes, Inc., TDI, John W. Kelly, and John Jeffrey Kelly. We reverse and remand solely on those points and need not address the others.

### A. Whether Gacki was 30 days behind on the loan

 The trial court determined that Respondents had demonstrated there were no genuine issues of material fact as to whether Gacki was actually 30 days or more behind on her loan payments, which allowed the Fund to file the quitclaim deed pursuant to the Loan Agreement. We disagree. The Loan Agreement in this case does not define when a payment is deemed

---

4. The Fund's motion for attorney's fees for this appeal was also taken with this case and

denied.

"late," thus complicating the determination of how far behind Gacki actually was on her payments. From the record before us, we find it unclear as to the amount that Gacki was behind on her loan payments at the time the quitclaim deed was filed. It seems clear from Gacki's bank statements that she was two payments (or approximately 15 days) behind as of November 1, 2011, as she had missed one payment in both September and October. Beyond this, it seems undeterminable how much Gacki actually fell behind.

Gacki's November bank statement shows that at least one payment was not made during this month. However, Gacki contends that the payments were late during that month because the Fund withdrew payments (the last three during that month) one day early. We find this contention plausible and contrary to Respondents' assertions to the trial court in its Statement of Uncontroverted Facts. We find it difficult to conclude that any of these payments could be considered late given that the Fund attempted to make them a day early in each instance—directly conflicting with the terms set forth by the Fund and John W. Kelly in a letter to Gacki dated June 18, 2010. At the least, we find that whether the payments were "late" is a material issue in dispute which should be determined by the finder of fact and precludes entry of summary judgment.

Further, pursuant to John W. Kelly's letter sent to Gacki on November 30, 2011, Gacki was informed that the Fund would no longer be withdrawing payments by ACH from her bank account (presumptively because of the failed payments in November) and that she would be required to mail a money order or cashier's check to the Fund for the full amount of her monthly payments beginning on December 1, 2011. While the Fund did have broad unilateral control under the Loan Agreement to make changes to when and how Gacki's payments were to be made, strict compliance with this change likely would have been impossible for Gacki. Assuming this letter was actually mailed on November 30, 2011, Gacki would likely have received it at the earliest on December 1, 2011—the very date upon which her entire monthly payment was now due. Again, it is unclear whether Gacki's entire December payment was late considering that the Fund unilaterally changed the method and frequency of Gacki's payments with the shortest amount of notice possible. Gacki's December 14, 2011 letter to John W. Kelly seemingly paying $627.40 (half of her monthly payment) also indicated that she intended to pay the other amounts she owed as soon as possible; however, we cannot tell from the record before us if she ever did. Other than Gacki's bank records from September, October, and November of 2011, the parties' own statements, and the communications between Gacki and the Fund, Respondents did not reference any evidence in the record to indicate that Gacki missed her remaining December 2011 payments or how much she was behind on her payments at the end of that month.

The only evidence that indicates how much she was behind on her payments at the end of 2011 is a letter to Gacki dated January 5, 2012, from John W. Kelly, as trustee for the Fund, that stated Gacki only owed $313.70 from the year of 2011 (in addition to a $100 late fee). Regardless of the assertions set forth in Respondents' Statement of Uncontroverted Facts to the trial court or Gacki's responses to such,[5]

---

5. In its Judgment Granting Defendants' Motion for Summary Judgment, the trial court ruled that Gacki's response of "Plaintiff is without sufficient information to admit or deny this statement and therefore denies the same" was not a proper denial of Respondents' Statement of Uncontroverted Facts and

that January 5, 2012 letter from John W. Kelly is significant evidence that contradicts Respondents' assertion that Gacki owed approximately $2,500 at the end of December 2011—especially considering that there are no payment records before us.

All parties admit that Gacki made a full monthly payment of $1,254.80 in January 2012. Gacki seemingly believed this would be applied to her next payment; the Fund asserts that the payment was applied to past late payments. Gacki then received a letter from John W. Kelly dated January 24, 2012, stating that she was now $1,254.80 (or 30 days) behind on her payments, which would allow the Fund to file the quitclaim deed and take possession of the home. Considering that Gacki had just made a full month's payment, this letter was obviously contrary to John W. Kelly's January 5, 2012 letter stating that Gacki was only one week behind. Like in December of 2011, there are no bank or payment records before us, nor were there seemingly any before the trial court, to indicate how much Gacki actually owed as of January 24, 2012; there were only the parties' statements and the letters to Gacki from the Fund. In response to John W. Kelly's January 24, 2012 letter, Gacki alleges she wrote checks to the Fund in February 2012 equaling $1,300, but those checks were apparently never negotiated by the Fund.

In connection with Gacki's alleged abandonment of the home (discussed below), the Fund filed the quitclaim deed on February 23, 2012, claiming that Gacki had fallen 30 days or more behind on her loan payments. Again, there are no payment statements or records before us, nor were there seemingly any before the trial court, that would clearly indicate that this was true. Respondents claim that even if Gacki did write and send checks equaling $1,300

in February 2012, she still would have been a full month behind on her payments that would have permitted the Fund to file the quitclaim deed. However, Respondents offer no evidence to support this other than their own statements.

Since there are genuine issues of material fact as to whether Gacki was 30 days or more behind on her loan payments, and thus whether the Fund was contractually permitted to file the quitclaim deed and take possession of the home, we reverse the trial court's judgments granting Respondents' and the Fund's motions for summary judgment and remand for proceedings consistent with this opinion.

## B. Whether Gacki abandoned the home

The trial court also found that there were no genuine issues of material fact as to whether Gacki had abandoned the home. Specifically, the trial court concluded that Gacki's statement in her February 7, 2012 letter to the Fund saying "I can't wait for the day to be out of the mortgage," her unresponsiveness to John W. Kelly's calls on February 9th and 12th, and John W. Kelly seeing people moving out of the home on February 17, 2012 were determinative that Gacki had abandoned the property and that the Fund was permitted to take possession of the home pursuant to the Loan Agreement. We disagree.

While "abandonment" is not defined in the Loan Agreement, at common law, abandonment is the relinquishment or surrender of property rights by one person to another. *Herron v. Barnard,* 390 S.W.3d 901, 909 (Mo. App. W.D. 2013). "Abandonment consists of two elements: (1) an intent to abandon, and (2) the external act by which the intention is carried into effect." *Id.* (quoting *Hoffman Mgmt. Corp. v. SLC of N. Am., Inc.,* 800 S.W.2d

deemed all paragraphs to which Gacki used that response to be admitted.

755, 762 (Mo. App. W.D. 1990)). "There must be a concurrence of the intention to abandon and the actual relinquishment of the property." *Id.* Intent may be inferred by strong and convincing evidence and may be demonstrated by conduct clearly inconsistent with any intention to retain and continue the use or ownership of the property. *City of St. Peters v. Hill,* 9 S.W.3d 652, 655–56 (Mo. App. E.D. 1999). The party claiming that property is abandoned has the burden of proof. *Id.* at 655.

■ The statement from Gacki's February 7, 2012 letter to the Fund that the trial court references in its judgment seems to be taken out of context, as the preceding sentence reads: "I plan on catching up with this absolute B.S. mortgage in the next couple of weeks with my tax returns. I can't wait for the day to be out of this mortgage ..." The trial court read this as a statement of her intent to abandon the property, but the letter as a whole indicates the opposite. At the very least, Gacki's letter is supportive of her claim that she did not intend to abandon the home and is contrary to how both Respondents used and the trial court perceived her statement taken from the letter.

Further, while Gacki admits she received John W. Kelly's phone calls on February 9th and 12th, she claims she ignored them, after taking his initial call, because of his harassing tone. She also claims that she did not feel the need to answer his calls after sending her February 7, 2012 letter that stated her intent to continue paying her loan obligations. Gacki's February 7, 2012 letter seems to support this contention and appears contrary to Respondents' claims that Gacki abandoned the property.

Respondents also cite John W. Kelly's sighting of people moving out of the home on February 17, 2012, as evidence that Gacki abandoned the home. Respondents also claim that John W. Kelly discovered that the electricity and gas were scheduled to be shut off at the home and asserts that this supports abandonment by Gacki. Gacki argues that John W. Kelly only assumed that she was abandoning the home because he saw her tenant, Robert Cooley, moving out while she was in the process of moving back in and transferring the utilities back to her name. Gacki also asserts, and John W. Kelly and the Fund deny, that the Fund was aware of Gacki renting the home to Robert Cooley.

The only evidence that Respondents cite in support that Gacki abandoned the property was John W. Kelly's own observations and assumptions; nothing in the record shows that Gacki committed an act to externalize any kind of intent to abandon the home. In fact, less than a week after John W. Kelly claims he saw people moving out of the home, Gacki attempted to enter and change the locks, but was stopped by Wentzville Police because the home had been "foreclosed on" by the Fund. Gacki's attempt to change the locks is evidence that she did not intend to abandon the property. Additionally, Robert Cooley allegedly still had thousands of dollars' worth of possessions inside the home when the Fund took possession of it. Leaving possessions of that worth inside the home is also evidence that it was not abandoned. *See In re Seeley,* 341 B.R. 277, 281 (Bankr. W.D. Mo. 2006) (citing *New Madrid Banking Co. v. Brown,* 165 Mo. 32, 65 S.W. 297, 298 (1901) and *Victor v. Grimmer,* 118 Mo.App. 592, 95 S.W. 274 (Mo. App. W.D. 1906)) (finding that leaving substantial personal possessions on property is corroborative of intent to return and thus tends to rebut any presumption of abandonment).

"A 'genuine issue' that will prevent summary judgment exists where the record shows two plausible, but contradictory, accounts of the essential facts." *Daugherty,* 231 S.W.3d at 818. The record shows there

is competing and contrary evidence as to whether Gacki had the intent to abandon the home and whether she took actions to actually do so. Thus, there are genuine issues of material fact as to whether Gacki abandoned the property and to whether the Fund was contractually permitted to take possession of the home. We reverse and remand for proceedings consistent with this opinion.

## C. Whether the trial court could hear Gacki's forcible entry and detainer action

■ As a part of its judgment granting Respondents' motion for summary judgment, the trial court determined that it could not hear Gacki's forcible entry and detainer action brought as Count II of her Petition. The court concluded that Gacki could not pursue that count before a circuit judge and instead had to bring that cause as a separate action in the associate division of the circuit court. We disagree.

For decades in Missouri, there were distinct jurisdictional differences between that of associate circuit judges and circuit judges. However, the Missouri legislature in 1989 amended § 478.220 to read "Circuit judges and associate circuit judges may hear and determine all cases and matters within the jurisdiction of their circuit courts." This effectively created concurrent jurisdiction between associate circuit and circuit judges with only a few exceptions (namely, that circuit court judges shall not hear and determine municipal ordinance cases unless the judge be transferred or assigned to hear and determine the case or that class of case). *See* § 478.220.

This Court has recognized such concurrent jurisdiction of associate circuit and circuit judges as recently as this year. *See Brainchild Holdings, LLC v. Cameron,* No. ED 104122, 2017 WL 1483332, at *3–4 (Mo. App. E.D. Apr. 25, 2017) (explaining that "[a]ny jurisdictional differences between circuit judges and associate circuit judges were abolished by the legislature in 1989."). Additionally, courts of this state have specifically held that forcible entry and detainer actions may be heard by circuit judges. *See Cooper v. Bluff City Mobile Home Sales, Inc.,* 78 S.W.3d 157, 167 (Mo. App. S.D. 2002).

Section 534.060 states that forcible entry and detainer cases "shall be heard and determined by associate circuit judges ... unless the plaintiff pursuant to subsection 2 of section 478.250 has designated the case as one to be heard under the practice and procedure applicable before circuit judges." Gacki did exactly that in paragraph 16 of her Petition, designating her forcible entry and detainer claim to be heard under the practice and procedure before circuit judges pursuant to § 478.250.2. Section 478.250.2 states:

> In those counties with centralized filing, if a case is within those categories of cases enumerated in subdivisions (1) and (2) of subsection 1 of section 517.011, the plaintiff when filing the case may designate at the time of filing that the case shall be heard and determined under the civil practice and procedure applicable before circuit judges, and *in such event the case shall be heard and determined by a circuit judge* unless an associate circuit judge shall be assigned or transferred to hear and determine the case pursuant to section 478.240 or 478.245 or Section 6 of Article V of the Constitution. If no such designation is made, the case shall be heard and determined under chapter 517.

(emphasis added). The Eleventh Circuit, where this case originated, seemingly has a centralized filing system, as Eleventh Circuit Court Rule 4.2 requires that all civil cases be filed with the civil division of the circuit clerk (i.e., a central location), which then assigns the cases. This makes

§ 478.250.2 applicable here.[6] Thus, pursuant to § 534.060 and § 478.250.2, the trial court could hear and determine Gacki's forcible entry and detainer claim.

While the trial court here did not cite its reason for concluding that Gacki's forcible entry and detainer action could only be heard by an associate circuit judge, Respondents argue that the trial court "was correct in holding that a Forcible Entry and Detainer case may only be brought in the Associate Circuit Courts." [7] However, Gacki is correct in her assertion that § 517.011 only applies the provisions of Chapter 517 to the practice and procedures in civil cases originally filed before associate circuit judges; it does not give associate circuit judges exclusive jurisdiction or authority over the chapters named in that statute. *See B.C. National Banks v. Potts*, 30 S.W.3d 220, 222–23 (Mo. App. W.D. 2000) (concluding that § 517.011 does not affect the concurrent jurisdiction of circuit and associate circuit judges); § 517.011. As the trial court could hear and determine Gacki's forcible entry and detainer action, it is remanded to the trial court.

Because we find that there are genuine issues of material fact regarding multiple issues and that remand is necessary, we need not ultimately determine the effect of using a quitclaim deed in conjunction with the Loan Agreement in this case. However, we note concerns with the effect of the trial court's judgments that enforced the Loan Agreement, but did not order the Fund to sell the home and apply the proceeds to any deficiency, as would be typical in a foreclosure proceeding where the defaulting borrower would only pay the defi-

cit of the loan balance minus the sale proceeds. The trial court's judgments here awarded the home to the Fund while also holding Gacki responsible for the entire balance due under the agreement—without any set off for either the value of the home or proceeds from the sale of the home.

## IV. Conclusion

We reverse the trial court's judgments granting Respondents' and the Fund's motions for summary judgment and remand for proceedings consistent with this opinion.

Mary K. Hoff, J., concurs.

Lisa S. Van Amburg, J., concurs.

---

**6.** We note that Eleventh Circuit Court Rule 6.2 states that the Associate Division has "exclusive jurisdiction" over unlawful detainer actions, but that rule is in direct conflict with the aforementioned cases establishing concurrent jurisdiction between circuit and associate circuit judges and with § 534.060 and § 478.250.2.

**7.** While there are no "Associate Circuit Courts," Respondents may have meant to reference the associate division of the circuit court.