Jamie F. PATTERSON, Plaintiff-Respondent,

v.

ROUGH ROAD RESCUE, INC., Steve Svehla and Linda Svehla, Defendants-Appellants.

No. ED 104425

Missouri Court of Appeals, Eastern District, DIVISION FIVE.

Filed: July 25, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied September 25, 2017

Jeffery T. McPherson, Harry M. Murray, IV., 7700 Forsyth Blvd., Suite 1800, St. Louis, MO 63105, Carolyn B. Theis, Daniel R. O'Brien, Daniel J. Kolde, 230 S. Bemiston, Suite 1420, St. Louis, MO 63105, for appellants.

Timothy C. Sansone, Amanda N. Johnson, Zachary S. Rozier, 600 Washington Avenue, 15th Floor, St. Louis, MO 63101,

11 North Main Street, Perryville, MO 63375, for respondent.

## LAWRENCE E. MOONEY, JUDGE

"Every dog must have his day."[1] And today is Mack's day.[2]

Mack is a three-year old dog, believed to be a boxer-mastiff mix. He was rescued by Rough Road Rescue, an animal-rescue organization located in Perry County, Missouri. Rough Road Rescue was founded by Steve Svehla and his wife, Linda Svehla, with the purpose of caring for stray animals and placing them with good families. The rescue group placed over one hundred animals with adoptive families since its inception in 2013. Jamie Patterson adopted Mack from the rescue in early 2015. The rescue group, however, reclaimed Mack after he bolted and escaped from the Patterson yard. The group asserted that Ms. Patterson violated the adoption contract, and that they had the right to retake Mack. Ms. Patterson disagreed. And so the parties went to trial to resolve this dispute.

### The Adoption

In 2014, Ms. Patterson stopped at the rescue facility with her son, so that he could donate some blankets he had made for the dogs housed at the rescue. While there, they met Mack, and instantly fell in love with him.

Ms. Patterson expressed an interest in adopting Mack. The rescue group informed her that they had a lengthy process for adoption that included several visits at the rescue facility, and then if those went well, a home visit. The rescue group also performs background and reference checks on the potential adoptive family. The only other matter the group mentioned to Ms. Patterson was that Mack would have to be neutered. Ms. Patterson believed that if she was approved for adoption, she would own Mack. And so she began the adoption process.

Ms. Patterson made two further visits to the rescue facility. The first time she and her son visited, to once again see Mack, and to ask Mr. Svehla a little more about Mack's personality. The second time, Ms. Patterson brought her other dog out to meet Mack, to see if the two dogs would get along.

The Svehlas brought Mack to the Patterson home for a visit on January 24, 2015. The visit went very well. Mack was very happy, and the Pattersons were very happy. The visit went so well, in fact, that the Svehlas decided to leave Mack and to complete the adoption that day. This came as a surprise to Ms. Patterson. Based on what the rescue group had told her, she expected this visit to be just a home visit and that the adoption would take place at some later date if the home visit went well.

To complete the adoption process, Ms. Patterson paid a $40 adoption fee and a $15 microchip fee. She also signed a document entitled "Animal Adoption Contract And Spay/Neuter Agreement." Ms. Patterson testified that the rescue group never told her that she would be required to sign anything before getting Mack. During the home visit, while Ms. Patterson and her children played with Mack, Mr. Svehla and

---

1. Quote attributed to Jonathan Swift.

2. The parties agree on little in this appeal, including the name of the dog. The rescue group insists on calling him "Jack." The Pattersons call him "Mack," the name they gave him after adopting him. The trial court in its judgment referred to the dog as "Mack." On review of a judgment in a court-tried case, we accept as true all evidence favorable to the prevailing party. *See, e.g., Rutherford v. Davis,* 458 S.W.3d 456, 458 (Mo. App. E.D. 2015); *Green v. Study,* 286 S.W.3d 236, 240 (Mo. App. S.D. 2009). We disregard evidence and inferences contrary to the judgment rendered. *Id.* Thus, we refer to the dog as "Mack."

Ms. Patterson's husband spoke about erecting a fence, and Mr. Svehla said that he would add that provision into the contract. Other than a fence, Mr. Svehla and Mr. Patterson did not talk about any other contractual terms. According to Ms. Patterson, the Svehlas neither read through the document with her before she signed it, nor told her what was in the document, other than reemphasizing the need to neuter Mack. Most particularly, the Svehlas did not review with Ms. Patterson the paragraph stating that Mack could be reclaimed by the rescue group if the Pattersons did not comply with the adoption contract. The process was so rushed that Ms. Patterson did not get a copy of the document she signed.

With the adoption process completed and Mack in her possession, Ms. Patterson believed that she owned Mack and that she had gained all rights to the dog. Ms. Patterson believed that the rescue group's use of the word "adoption" meant full ownership, and nothing less, Ms. Patterson did not know that the rescue group would claim the authority to take Mack away from her. Had she known this, Ms. Patterson would not have signed the contract. Ms. Patterson only became aware of the provision some eleven months after adopting Mack, when the rescue group reclaimed Mack and refused to give him back to the Patterson family.

### The Adoption Contract

The adoption contract used by the rescue group states in pertinent part that the adopter "acknowledge[s] receiving custody of the above described animal from ROUGH ROAD RESCUE, INC.," and that the adopter "agree[s] to abide by the following conditions....."[3] The contract then lists ten enumerated conditions, the most relevant of which are:

1. I will have my adopted pet spayed/neutered within 60 days of the spay/neuter date above. After which, I will provide proof of Sterilization to Rough Road Rescue, Inc., Missouri Law requires the spaying or neutering of animals adopted from this and similar facilities.

   . . .

3. I will provide humane care, giving the animal proper food, water, shelter, exercise and love. I will provide competent veterinary care in case of illness and injury. I will have my pet inoculated annually or as recommended by a licensed veterinarian.

4. I will comply with all laws and ordinances in force in the area in which I reside, applicable to said animal.

   . . .

9. Any noncompliance of this adoption contract by the above mentioned owner, may void this contract. And could immediately give a representative of Rough Road Rescue, Inc. the authority to take possession of said animal.

10. Additional Stipulation: (in handwriting) Adopter agrees to provide a fenced yard for said animal by May 1st, 2015.

Rough Road Rescue drafted its own adoption contract. Mrs. Svehla and Gila Todd, then secretary and member of the rescue's board of directors, crafted the agreement, using provisions and language that they found in contracts used by other animal-rescue organizations.

Ms. Todd and the Svehlas disagree about the contract's meaning. In Ms. Todd's view, an "adoption," as used in Rough Road Rescue's contract, would sev-

---

**3.** We have reproduced the adoption contract in an appendix to this opinion.

er all rights of the previous owner. To her, "adoption" means that the animal is transferred to a new family, to be a family member of that adoptive family, much like the adoption of a child. In short, she believes that Rough Road Rescue should not consider itself the owner of the animal after adoption. Mr. Svehla, on the other hand, believes the adoption is conditional and that he has the legal right to retake Mack. However, he also indicated at trial that he did not fully appreciate the meaning of the terms of the contract. He acknowledged that terms in the contract could be construed as having two different meanings, depending on the circumstances. Mrs. Svehla testified that the group's intention in placing an animal was to secure it a permanent home.

### Mack, the Recidivist Runner

By numerous accounts, Mack fit in very well with the Patterson family. He enjoyed playing with the children, and loved to run around the yard with them. Ms. Patterson had Mack neutered and ensured that he received all his shots. Ms. Todd, the board member, photographed the family with Mack, and thought the Pattersons were a good fit for Mack. To her, the Patterson home was a very loving household, and Mack seemed very happy. The only difficulty was that Mack absconded on several occasions. Ms. Patterson acknowledged that Mack was "very quick." The town of Perryville cited Ms. Patterson three times for her dog running at large. She pleaded guilty to the offenses, because she acknowledges that she should obey the law.

On the last occasion Mack took off, both Ms. Patterson and Rough Road Rescue placed rewards for Mack's return. Mack was returned to Rough Road Rescue. Ms. Patterson entreated for Mack's return to her home. Initially Mr. Svehla prevaricated about possessing Mack. Ultimately Mr. Svehla refused to return Mack, asserting that Ms. Patterson would never see Mack again. When the Board of Rough Road Rescue voted to back Mr. Svehla in his refusal, Ms. Todd resigned. She described the rescue group's conduct as "shady and underhanded."

### Legal Proceedings

Ms. Patterson sued the Svehlas and Rough Road Rescue for replevin and conversion. Ms. Patterson alleged that she was the owner of Mack, and that she was entitled to immediate possession of Mack, then wrongfully in the defendants' possession. Ms. Patterson argued that she became the owner of Mack upon signing the adoption contract and gaining possession of Mack on January 24, 2015. The defendants, believing they had the legal right to retake Mack, countered that ownership remained conditional on Ms. Patterson complying with the terms in the adoption contract, and that under that contract, they had the right to retake Mack if Ms. Patterson failed to comply with the contract's terms. Defendants argued that Ms. Patterson had breached the contract by failing to provide a fenced yard by May 1, 2015, by failing to keep a fenced yard after that date, and by violating the city's running-at-large ordinance. The defendants thus counterclaimed for breach of contract, seeking a declaration that Ms. Patterson had breached the contract, that the rescue had a right to retake possession and ownership of Mack, and that Ms. Patterson was divested of any claim to the dog.

The parties proceeded to a bench trial, after which the trial court ruled in favor of Ms. Patterson. The trial court granted Ms. Patterson's petition for replevin, held that the conversion claim was moot, and denied the defendant's petition for breach of contract. In so ruling, the trial court concluded that the matter at hand was governed by the Uniform Commercial Code (UCC). The court found that the dog was a "good"

under the code, and that title to and ownership of Mack was transferred to Ms. Patterson upon execution of the adoption contract. The court determined that the defendants did not intend for Ms. Patterson to have temporary guardianship or to foster Mack, but rather to own Mack. The trial court next concluded that Ms. Patterson had satisfied her contractual obligations, and thus the grounds alleged by the defendants were insufficient for them to reclaim the dog, regardless of whether the security interest allowing repossession was enforceable.

Having found that Ms. Patterson proved the elements of replevin, the trial court ordered defendants to return Mack to the Sheriff of Perry County, and if they failed to do so, ordered the Sheriff to retake the dog and deliver him to Ms. Patterson.[4] Mr. Svehla did not relinquish Mack. Mr. Svehla was jailed for contempt of court, but was released after posting a supersedeas bond. According to the parties, Mack remains in the possession of Rough Road Rescue.

### Contentions on Appeal

The defendants appeal the trial court's judgment, asserting three points of trial-court error. They first challenge the trial court's conclusion that the adoption was governed by the UCC. The defendants contend that the code does not apply because the adoption was not a "sale" and because they are not "sellers" or "merchants" as defined by the code. Defendants next fault the trial court for failing to enforce the contract. They contend that they retain a reversionary interest in the dog that permits them to retake and retain the dog due to Ms. Patterson's failure to comply with the terms of the adoption contract. Defendants maintain that Ms. Patterson breached the adoption contract by failing to erect a fence and by violating the city's running-at-large ordinance. Lastly, the defendants challenge the amount of the bond, $2,500, as being grossly excessive.

### Discussion

Replevin is a long-standing civil remedy, with deep common-law roots. *Lacoste v. Sys. & Servs. Techs., Inc.*, 126 So.3d 111, 114 (Miss. App. 2013). It is said that "[r]eplevin is one of the most ancient and well-defined writs known to the common law." *Id.*; *see generally, Fuentes v. Shevin*, 407 U.S. 67, 78-79, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). This Court has considered before how this writ should apply in circumstances where the contested property car-

---

4. Missouri Supreme Court Rule 99.12 provides that the value of the property be determined and damages for the taking may be assessed whenever the court finds that a party not in possession of property is entitled to possession. The Rule further directs that the trial court should enter judgment against the party for the return of the property or the value of the property, at the election of the party entitled to possession. Rule 99.13 sets forth directions for the election by the prevailing party, instructing that the election be made after the property is in the possession of the sheriff, that the prevailing party has ten days to elect after notice, and that the election is to be made in writing and filed with the court. The trial court and parties did not follow these procedures. The trial court nei-

ther determined value nor afforded Ms. Patterson a formal opportunity to elect. We acknowledge that other decisions have either dismissed the appeal or remanded for further proceedings in such a situation. *Lafayette v. Courtney*, 189 S.W.3d 207 (Mo. App. W.D. 2006)(remanded for further proceedings); *Jefferson v. Bick*, 840 S.W.2d 890 (Mo. App. E.D. 1992)(appeal dismissed); *accord Magna Bank of Missouri v. J.A. Saab Real Estate Co.*, 955 S.W.2d 40 (Mo. App. S.D. 1997). However, neither party has raised this matter and we conclude a remand is unnecessary. The necessity of a damage determination is for election purposes only, and by her actions and assertions Ms. Patterson has obviously elected for Mack's return rather than money damages.

ried great emotional weight.[5] Today, we find that replevin was properly granted, because Ms. Patterson is the rightful owner of Mack.

■■■ Replevin is a possessory action to obtain property that is in the defendant's possession. *Herron v. Barnard*, 390 S.W.3d 901, 908 (Mo. App. W.D. 2013). Replevin requires proof of the following three elements: 1) that the plaintiff owned the property or was entitled to possess it; 2) that the defendant took possession of the property with the intent to exercise some control over it; and 3) that the defendant, by exercising such unauthorized control over the property, deprived the plaintiff of his right to possession. *Id.* at 909. As the plaintiff, Ms. Patterson has the burden of proof. *Id.* She must prove her right to immediate possession of Mack at the time she filed suit and that the defendants were then wrongfully detaining Mack. *Id.*

■■■ Ms. Patterson founded her claim to possession of Mack based on the adoption contract. Interpretation of a contract is an issue of law that we review *de novo. Belton Chopper 58, LLC v. North Cass Dev., LLC,*

496 S.W.3d 529, 532 (Mo. App. W.D. 2016). When we conduct a *de novo* review, we may affirm the judgment on any theory supported by the record. *Id.* And we will affirm the judgment under any reasonable theory supported by the evidence. *Gen. Motors Acceptance Corp. v. Crawford*, 58 S.W.3d 529, 532 (Mo. App. S.D. 2001). This Court is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result. *Courtney v. Dir. of Revenue*, 477 S.W.3d 659, 666 (Mo. App. W.D. 2015). Whether the UCC applies in this case is of no consequence. If the trial court reached the correct result, we will affirm, even if the trial court's reasoning is wrong or insufficient. *Rutherford v. Davis*, 458 S.W.3d 456, 458-59 (Mo. App. E.D. 2015). The only question we need resolve is who has the right to Mack.

■■■ The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005). Where the parties have expressed their final agreement in writing and no ambigui-

---

5. In *Guthrie v. Weaver*, 1 Mo.App. 136 (1876), one of this Court's earliest opinions, a father and son-in-law each sought possession of a casket—a casket holding the remains of their dearly departed daughter and wife, already buried at Bellefontaine Cemetery. Maggie J. Guthrie died on January 25, 1873. Pursuant to her death-bed request, Maggie was buried in her father's lot at Bellefontaine Cemetery. Maggie's husband witnessed the request, helped in selecting the casket, and was present at the funeral and burial. Prior to the funeral, Maggie's husband intimated an intention to remove Maggie to a lot of his own, once procured. After the funeral, Maggie's husband demanded possession of the casket and his wife's remains, in order to reinter them. Maggie's father refused. Maggie's husband filed a replevin action, seeking possession of the casket and Maggie's remains. The trial court issued an order to the sheriff, to deliver the casket and its contents to Maggie's

husband, Charles Guthrie. Maggie was disinterred on May 19, 1873 and reinterred in the lot of her husband's mother, which was also located in Bellefontaine Cemetery. On appeal, brought by Maggie's father, Christopher Weaver, this Court concluded that replevin for a corpse was indecent, inhuman, and highly inappropriate, and that Maggie should have never been moved in the first place. Accordingly, we reversed the trial court's judgment and entered judgment in favor of Mr. Weaver. However, in so ruling, we declared that a dead body is not property, and that no right to the corpse remained "except the right to protect it from insult." In our view, the precepts of a civilized community and the sanctities of the tomb demanded that Maggie remain where she was buried. According to the cemetery's burial records, Maggie remains buried in the Guthrie lot today, next to her husband.

ty exists, the court determines the intent of the parties and the contract's clear meaning solely from the four corners of the contract itself. *Mid Rivers Mall, L.L.C. v. McManmon*, 37 S.W.3d 253, 255-56 (Mo. App. E.D. 2000); *Smith v. Taylor-Morley, Inc.*, 929 S.W.2d 918, 922-23 (Mo. App. E.D. 1996). The Court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language. *GP & W Inc. v. Daibes Oil, LLC*, 497 S.W.3d 866, 870-71 (Mo. App. E.D. 2016).

To determine whether a contract is ambiguous, we "consider the whole document and, absent any definition within the contract, give contract terms their natural and ordinary meaning." *Smith*, 929 S.W.2d at 921. The test for ambiguity is whether the disputed language is reasonably susceptible of more than one meaning when the words are given their plain meaning as understood by an average person. *See, e.g., Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 839-41 (Mo. App. W.D. 2004). A contract is ambiguous if the language is reasonably susceptible to two or more interpretations. *Id.* at 841. An ambiguity exists if the contract promises something in one point and takes it away in another. *Behr v. Blue Cross Hosp. Serv., Inc., of Missouri*, 715 S.W.2d 251, 256 (Mo. banc 1986). An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract. *J.H. Berra Constr. Co., Inc. v. City of Washington*, 510 S.W.3d 871, 874-75 (Mo. App. E.D. 2017). Ambiguities may be patent, arising upon the face of the document, or latent, arising where a contract cannot be executed due to the ambiguity. *Smith*, 929 S.W.2d at 922-23.

If a contract is ambiguous, we may look past the corners of the contract to ascertain the intent of the parties. *J.H.*

*Berra Constr.*, 510 S.W.3d at 874-75; *Lacey*, 131 S.W.3d at 841. In so doing, we construe the ambiguity and interpret the contract in the light most favorable to the party who did not draft the contract. *Lacey*, 131 S.W.3d at 842. To aid in construing an ambiguous contract, recourse must be had to evidence of the relationship of the parties, the circumstances surrounding execution of the contract, the subject matter of the contract, the acts of the parties in relation to the contract, and any other external circumstances that cast light on the intent of the parties. *Baker v. Whitaker*, 887 S.W.2d 664, 670 (Mo. App. W.D. 1994); *Mt. Hawley Ins. Co. v. Azia Contractors, Inc.*, 886 S.W.2d 640, 642-43 (Mo. App. W.D. 1994). We interpret contracts to reach fair, reasonable, and practical results, for it is to be presumed that the parties contracted to that end. *Baker*, 887 S.W.2d at 669. We will reject any interpretation that involves unreasonable results, when a probable and reasonable construction can be adopted. *Belton Chopper 58*, 496 S.W.3d at 532-33.

This Court admires the rescue group's meritorious mission. But we do not admire their confusing contract. Let us consider the third paragraph of conditions. There, the contract states that the adopter "will provide humane care, giving the animal proper food, water, shelter, exercise and love." These terms and conditions are aspirational, but subjective. Next, the "repossession" provision in the ninth paragraph of conditions states that any noncompliance "may" void the contract, and that said noncompliance "could" give the rescue group the authority to repossess the animal. "May" and "could" are conditional words as to what might occur, rather than what must result. Indeed, Mr. Svehla himself acknowledged that repossession would depend on the circumstances. Finally, the rescue group asserts

it has the right to repossess the animal anytime over the course of the animal's life if the contract's conditions are not fulfilled to the group's satisfaction. But the repossession provision itself refers to the adopter as the "owner," implying that the adopter acquires ownership, not merely possession of the animal. Ownership of property, as commonly understood, means to have or hold property as one's own, with full and exclusive rights to that property. *See, e.g., Webster's Ninth New Collegiate Dictionary*, Merriam-Webster Inc., Springfield, Massachusetts, p. 843; *BusinessDictionary*, WebFinance, Inc., http://www.businessdictionary.com/definition/ownership.html. The adoption contract speaks of ownership but then seeks to compromise that ownership.

All these ambiguities must be construed against the defendants, the drafters of the agreement. Unusually, here one of the rescue organization's former board members, who herself assisted in the drafting of the agreement, testified for Ms. Patterson. Ms. Todd believed that Ms. Patterson owned Mack and that the rescue group had no claim on the dog. Ms. Patterson had the same understanding. Mrs. Svehla herself

noted that the group intended to find a permanent home for the animal. And so it shall be.[6]

We construe and hold that the adoption contract granted Ms. Patterson ownership of Mack. The contract language and precepts of contract interpretation compel this conclusion. Moreover, to hold otherwise would result in the rescue group maintaining a long leash on Mack for the duration of his life. Such a result is unreasonable. The trial court reached the correct conclusion. Replevin properly lies here. The trial court correctly and rightfully ordered the return of Mack to Ms. Patterson.[7]

Animal-welfare advocate Roger Caras once remarked that "Dogs are not our whole life, but they make our lives whole." The time has come for Mack to be returned home and the Patterson family made whole.

We affirm.

PHILIP M. HESS, P.J., and GARY M. GAERTNER, JR., J. concur.

### Appendix

**6.** We agree with the trial court's conclusion that Ms. Patterson fulfilled the terms of the adoption agreement. She had Mack neutered and ensured that he received his shots. She provided a fenced yard for Mack by May 1, 2015. Indeed, she deliberately moved to a home with a fenced-in yard, to comply with the condition. We find no provision in the contract imposing an ongoing duty to maintain a fence after this date. Granted, Mack absconded, but as Ms. Patterson and Ms. Todd noted, dogs can be willful. Ms. Patterson conscientiously took measures to prevent Mack from escaping and running loose through town. And when he did, she took immediate measures to find him and bring

him home. Ms. Patterson also attempted to secure veterinary care for Mack when he was injured, but Mr. Svehla thwarted her efforts. And lastly, by all accounts, Mack was a good fit with the Patterson family.

**7.** The defendants challenge the amount of the supersedeas bond, $2,500, as being grossly excessive. On December 6, 2016, during the pendency of this appeal, the defendants filed a Rule 81.09(c) motion in this Court, requesting that we reduce the amount of the bond. We denied that motion on December 15, 2016. We stand by that ruling. We deny this point.

# ANIMAL ADOPTION CONTRACT
## And Spay/Neuter Agreement

**16PR-AC00051**

EXHIBIT

_A_

Electronically Filed - Perry - February 23, 2016 - 11:58 AM

Rough Road Rescue, Inc.
Animal Care Facility License # RQ-8774
9126 S. Hwy. 51 Perryville, MO 63775
573 547-8070

I acknowledge receiving custody of the above described animal from ROUGH ROAD RESCUE, INC. and I agree to abide by the following conditions:

1. I will have my adopted pet spayed/neutered within 60 days of the spay/neuter due date above. After which, I will provide proof of Sterilization to Rough Road Rescue, Inc. Missouri Law requires the spaying or neutering of animals adopted from this and similar facilities.

2. I understand that I am adopting a pet whose background and medical history may be unknown, or information is based on previous owner statements and may not be accurate.

3. I will provide humane care, giving the animal proper food, water, shelter, exercise and love. I will provide competent veterinary care in case of illness and injury. I will have my pet inoculated annually or as recommended by a licensed veterinarian.

4. I will comply with all laws and ordinances in force in the area in which I reside, applicable to said animal.

5. I will not sell, give away, re-home or abandoned the animal. I will keep the animal in my custody as a loved companion. If for whatever reason I cannot keep the animal, I must contact Rough Road Rescue and make arrangements to return the animal to them. And there will be no refund on the animal.

6. I will not allow no one to use said animal for any experimental purpose whatsoever.

7. I agree that I will not hold Rough Road Rescue, Inc. responsible for any illness of the animal nor for any damages which the animal may do to any person or property.

8. A copy of the adopters Driver's License is required before adoption is allowed and completed.

9. Any noncompliance of this adoption contract by the above mentioned owner, may void this contract. And could immediately give a representative of Rough Road Rescue, Inc. the authority to take possession of said animal.

10. Additional Stipulation: Adopter agrees to provide a fenced yard for said animal by May 1st, 2015.

Adoption Fee $ _40⁰⁰_  Microchip Fee $ _15⁰⁰_  Other Donation $_____  Total $ _____

Adopter _____  R.R.R. _____

This contract must be signed by a R.R.R. Representative to be Valid. Otherwise it is null & void.

1/16/11

ectronically Filed - Perry - February 23, 2016 - 11:48 AM

## ANIMAL ADOPTION CONTRACT
### And Spay/Neuter Agreement

Rough Road Rescue, Inc.
Animal Care Facility License # RQ-8774
9126 S. Hwy. 51 Perryville, MO 63775
573 547-8070

Date __1-24-2015__

Name __Jamie Lohman__     Home Phone # _____

Address __101 S. Moulton__     Cell Phone # __573) 846-7534__

City __Perryville__   State __Mo__   Zip __63775__   Work # _____

E-Mail Address _____

**ANIMAL INFORMATION:**    Name __(Happy) Jack__   Intake # __DM075__

Breed __Border/Aussie Mix__   Color __Brown/Black w/white__   Sex __Male__   Age/DOB __12-16-11/3yrs old__

Microchip # __   AVID*042*821*086 ____

**VACCINATION RECORD:**   HEALTH EXAM __6-16-14__   RABIES __6-16-14__

DHLPP (dog) __6-16-14__   FVRCP (cat) _____

Heartworm Test __6-16-14__   (Neg)/or Pos   (R.R.R. administers Iverhart Max/Heartworm Preventative on the 1st of each month to all dogs on premises.)

De-Wormed __6-16-14 (Hook)__   NEXT VACC. DUE __June 2015__

Any Chronic Health Conditions/Problems _____

DATE *SPAY/NEUTER* IS TO BE DONE BY: __April 1, 2015__

### For Rough Road Rescue Use Only:

Date Reminder Ltr Sent _____   Date 2nd Reminder Ltr Sent _____

Date 1st Phone Call _____   Date 2nd Phone Call _____

Comments: _____

Surgery Done Date _____ (Please Attach Proof of Sterilization) -or-

Verified by (Vet) _____   Verified by (R.R.R.) _____