

# Missouri Court of Appeals
## Southern District
### Division Two

STEVEN CHADWICK, )
)
Respondent )
) No. SD36850
vs. )
) **FILED: September 16, 2021**
ROBERT HUNTOON, and )
GEORGE SWEARENGIN, )
)
Appellants. )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Michael J. Cordonnier

**<u>AFFIRMED</u>**

This case requires us to decide whether a member of a limited liability company ("LLC") expelled without cause is entitled to compensation for his member's interest under the company's operating agreement. Robert Huntoon and George Swearengin ("Appellants") expelled Steven Chadwick ("Respondent") without cause from Liberty Home Solutions, LLC (the "Company"). Following his expulsion from the Company, Respondent filed a petition against the remaining members of the Company alleging he was entitled to be compensated for his member's interest. The trial court entered judgment in Respondent's favor, awarding him actual damages, punitive damages, and attorney's fees. Appellants appeal the trial court judgment, raising eight points

challenging:  the trial court's interpretation of the operating agreement (points 1, 2, 3, and 5); the trial court's determination of the value of the Company (point 4); the denial of Appellants' affirmative defense of accord and satisfaction (point 6); and the trial court's award of punitive damages (point 7) and attorney's fees (point 8).  Finding no merit in Appellants' points, we affirm.

## Factual and Procedural Background

In March 2007, Respondent and Appellants entered into a contract ("operating agreement") for the operation of the Company, which was in the business of home remodeling and repairs.  The operating agreement gave each member a one-third interest in the Company.  From 2013 to 2017, the Company's yearly total membership distributions averaged over $170,000 and its total income exceeded $2.5 million.

In May 2018, Appellants expelled Respondent without cause pursuant to section 7.4(A) of the operating agreement, which states, in pertinent part, that Appellants would assume all indebtedness and would indemnify Respondent from liability on the company's debts.  "In addition, the remaining Members and the Company shall pay the expelled Member the sum of $1,000 per week for twelve (12) weeks commencing not later than two (2) weeks after the expulsion."  Respondent was given a check in the amount of $1,000 and a letter informing him he had been expelled as a member "without cause[.]"  The letter stated Respondent would receive 12 payments of $1,000 as required by section 7.4(A) of the operating agreement and that Appellants would assume all indebtedness and would indemnify him from liability on the company's

2

debts.[1]  Respondent received and cashed  11 more payments of $1,000.  Following

Respondent's expulsion, Appellants continued operating the business.

Respondent filed a petition against Appellants seeking compensation for his

member's interest.[2]  Appellants filed an answer and asserted the affirmative defense of

accord and satisfaction based on Respondent's acceptance of the 12 payments of $1,000.

The case was tried to the trial court, which ruled in Respondent's favor.  The trial

court determined a Company member had two sets of interests:  (1) participation rights

and (2) distribution rights.  The trial court found the 12 payments of $1,000 following

Respondent's expulsion were payments for "participation rights" under section 7.4(A) of

the operating agreement and were not intended to compensate the member for his

distribution rights.  The trial court found Appellants' testimony about the intent of

section 7.4(A) of the operating agreement to be not credible.  The trial court also

determined the expulsion of Respondent was a "Dissociation Event" described in Article

VIII of the operating agreement.  Further, since Appellants did not purchase

Respondent's member's interest, the trial court found Respondent retained the interest

and was entitled to distributions from the Company in the amount of $4,500 per month

for 23 months following his expulsion, totaling the sum of $103,500.  The trial court

further found Respondent's expulsion constituted a dissociation event triggering a "Buy-

out Default" under section 8.3(A) of the operating agreement and awarded Respondent

damages for breach of contract in the amount of $300,000 (1/3 of $900,000, which the

---

[1] The letter also advised that Respondent would receive a portion of a recent member's distribution upon the return of a Company vehicle.

[2] Respondent's petition stated claims for:  declaratory judgment declaring a right to withdrawal (Count 1); breach of the operating agreement (Count 2); breach of the duty of good faith and fair dealing (Count 3); breach of fiduciary duties (Count 4); and conversion (Count 5).  Counts 4 and 5 sought actual and punitive damages.

trial court found to be the "value" of the Company). The trial court determined Appellants breached a fiduciary duty owed to Respondent and awarded punitive damages in the amount of $25,000. Respondent was also awarded attorney's fees in the amount of $44,000. This appeal follows.

*Points 1, 2, and 5*

Because our analysis of points 1, 2, and 5 rely on the same principles of law, we address them together. In point 1, Appellants argue the trial court erred in determining Respondent was entitled to compensation "not specifically provided for within section 7.4(A) <u>because</u> the operating agreement . . . did not provide for payments to be made to an expelled member other than the $1,000.00 payments for a period of twelve (12) weeks." Appellants' point 5 follows the same logic as point 1, arguing the operating agreement did not entitle an expelled member to distributions after the date of his expulsion. In point 2, Appellants argue the trial court erred in determining the operating agreement provided members with two types of property interests, "participation rights" and "distribution rights." Each of these points assume that Section 7.4(A) limits compensation to a member expelled without cause to 12 payments of $1,000 and that a member becomes divested of his member's interest upon expulsion.

**Standard of Review**

We will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. ***Nicolazzi v. Bone***, 564 S.W.3d 364, 370 (Mo. App. E.D. 2018). The interpretation of an LLC's operating agreement is a question of law, which we review *de novo.* ***CB3 Enters. LLC v. Damas***, 415 S.W.3d 163, 166 (Mo. App. W.D. 2013).

4

**Discussion**

Appellants argue that Section 7.4(A) limits compensation to a member expelled without cause to 12 payments of $1,000. The trial court, in rejecting Appellants' argument, determined that the 12 payments referenced in Section 7.4(A) were intended as compensation for the loss of Respondent's right to participate in the management of the Company but did not extinguish his rights to distributions. Whether this determination was in error turns on the effect expulsion without cause has on a member's rights to distributions under the operating agreement. In answering this question, we look to the Limited Liability Act ("the Act")[3] and the operating agreement signed by the parties. *See **Urban Hotel Dev. Co., Inc. v. President Dev. Grp., L.C.***, 535 F.3d 874, 878 (8th Cir.2008) (interpreting Missouri law).

LLCs are creatures of statute and their "corresponding rights and obligations are derived from statute." ***Hibbs v. Berger***, 430 S.W.3d 296, 313-14 (Mo. App. E.D. 2014) (quoting ***Pitman Place Dev., LLC v. Howard Inv., LLC***, 330 S.W.3d 519, 530 (Mo. App. E.D. 2010). These rights and obligations are set out in the Act. *See **id.*** The Act, however, gives members significant flexibility in overriding statutory provisions which would otherwise prevail if the members fail to incorporate such provisions in their operating agreements.[4] *See* Phillip G. Louis, Jr., 25 **Mo. Prac.**, Business Organizations § 8.19 (2d ed. 2021). Because the Act supplies default terms which can be overridden in the operating agreement when authorized by the Act, our analysis follows a two-step framework: (1) determine what effect expulsion without cause has on the member's

---

[3] The Act is located in Chapter 347, RSMo. All references are to RSMo. (2000) unless otherwise indicated.
[4] "Throughout [the Act], phrases such as 'except as otherwise provided in the operating agreement' or 'unless the articles of organization provide otherwise' appear. Therefore, if an overriding provision is not incorporated into the relevant document, one is 'defaulted' to the statutory provision which will control." *See* Phillip G. Louis, Jr., 25 **Mo. Prac.**, Business Organizations § 8.19 (2d ed. 2021).

interest under the Act (the "default terms"); and (2) determine whether the operating agreement contains a provision overriding the Act's default terms.

Since the question before us is what effect expulsion without cause has on a member's interest under the operating agreement, we must clarify what we mean by a "member's interest." The Act defines a "member's interest" as a "member's share of the profits and losses of [the LLC] and the right to receive distributions of [the LLC] assets[.]" § 347.015(12). The operating agreement does not define a "member's interest", therefore, the Act's definition applies. The operating agreement does, however, define "profits and losses" as "[t]he Company's income, gains, losses, deductions, and credits . . . for each fiscal year of the Company" and those "shall be allocated among the Members (for both book and tax purposes) in proportion to their respective Distribution Percentages." A "Distribution Percentage" for each member under the operating agreement is "thirty-three and one-third percent (33 1/3%)." Accordingly, each member of the Company has a member's interest in one-third of the Company's profits and losses and distribution of assets.

Having determined what a member's interest is, we proceed to the Act to determine what effect expulsion without cause has on that interest. Section 347.121 addresses the consequences of withdrawal of a member. Under section 347.123(3) a member expelled in accordance with the operating agreement is a withdrawn member. Section 347.121(3), states that "[e]xcept as otherwise provided in the operating agreement, upon the withdrawal of a member, the withdrawn member shall have no further right to participate in the management and affairs" of the company and "shall have only the rights of an assignee of the withdrawn member's interest." So, unless an operating agreement provides otherwise, an expelled member cannot participate in the

6

management of the company but retains his rights to his member's interest—the right to share in the profits and losses and distribution of assets—as an assignee.

While section 347.121(1) describes the effect a withdrawal event has on a member's interest, (which includes expulsion in accordance with the operating agreement), section 347.103(2) describes the process for determining the amount of the expelled member's distribution if the business is continued. This section states, in relevant part:

> *except as otherwise provided in the operating agreement*, such member shall have the rights of an assignee of the withdrawn member's interest in the limited liability company. The withdrawn member shall be entitled to receive any distributions to which he is entitled upon such event of withdrawal under the provisions of the operating agreement. *If the operating agreement does not provide for the amount of or a method for determining the distribution*, if any, to which a withdrawn member is entitled, the withdrawn member shall be entitled . . . to receive from the limited liability company, upon demand for such distribution made by or on behalf of such withdrawn member within one hundred eighty days after such event of withdrawal and subject to the limitation set forth in section 347.109, *the fair value of such withdrawn member's interest* in the limited liability company as of the date of withdrawal based upon such withdrawn member's right to share in distributions from the limited liability company as an ongoing operation.

§ 347.103 (emphasis added). Thus, under the default terms of the Act, a member expelled without cause is entitled to "the fair value" of his member's interest if the business continues.

Having established what effect expulsion without cause has on a member's interest under the Act, we turn to the operating agreement to see if the parties included any overriding provisions. In interpreting an LLC's operating agreement, we apply the ordinary rules of contract law. *Nicolazzi*, 564 S.W.3d at 370. The cardinal rule in interpreting a contract is to ascertain the intent of the parties and give effect to that intent. *McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. App. E.D. 2016). In doing so,

7

"[w]e rely on the plain and ordinary meaning of the words in the contract and consider the document as a whole." *Id.* "The clauses must be read in the context of the entire contract, and interpretations that render provisions meaningless should be avoided." *Id.* If a contract's terms are clear and unambiguous, we enforce the agreement as written and will not supply additional terms.[5] *Nicolazzi*, 564 S.W.3d at 371.

Section 7.4 provides:

(A) A majority of the Members may vote to expel another Member, with or without cause. Unless the expulsion is for cause, the remaining Members shall assume all the indebtedness of the Company and indemnify the expelled Member from any liability on account of the Company's debts. In addition, the remaining Members shall exercise their best efforts to secure a release of the expelled Member from any Company debts that the expelled Member may have personally guaranteed. In addition, the remaining Members and the Company shall pay the expelled Member the sum of $1,000 per week for twelve (12) weeks commencing not later than two (2) weeks after the expulsion.

(B) If a Member is expelled for cause, the Member shall receive an amount equal to one-third (1/3) of the fair market value of all the assets of the Company plus one-third (1/3) of the retained earnings less one-third (1/3) of the Company's aggregate indebtedness, less damages caused to the Company as a result of the cause for which the Member was expelled. "Cause" shall include but not be limited to any act of fraud, misappropriation or personal dishonesty relating to or involving Company in any material way, the gross negligence of Member in connection with the performance of his duties under this Agreement or in his duties in furtherance of the Company's business, a continuing material breach of this Agreement which is failed to be cured within ten (10) days after written notice thereof, or a Member's taking actions that are clearly contrary to the best interest of Company.

---

[5] Mere disagreement over the meaning of terms in a contract does not create an ambiguity. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. App. W.D. 2015). However, a contract containing language reasonably susceptible of two interpretations is ambiguous. *Patterson v. Rough Rd. Rescue, Inc.*, 529 S.W.3d 887, 894 (Mo. App. E.D. 2017).

8

Section 7.4 says nothing about an expelled member's rights to distributions following expulsion without cause. While the operating agreement obligates the Company to pay a member expelled without cause $1,000 per week for 12 successive weeks, there is no language that states this compensation is *in lieu* of a member's interest or that an expelled member waives, forfeits, or is otherwise divested of that interest. Likewise, there is no language that transfers the member's interest, which is the member's personal property, to the remaining members upon expulsion. The operating agreement is silent as to the effect of expulsion on that member's interest.[6] As such, we must apply the default terms of the Act, sections 347.121 and 347.103, which give Respondent the right to receive his distribution percentage (i.e., his member's interest) as an assignee but eliminate his right to participate in the management and affairs of the Company.

For these reasons, points 1, 2, and 5 fail. Upon expulsion without cause, Respondent retained the right to receive distribution of his member's interest as an assignee but lost his right to participate in the management and affairs of the Company under the Act. Points 1, 2, and 5 are denied.

*Point 3*

In point 3, Appellants argue:

> The trial court <u>erred</u> in determining, as a matter of law, that the unambiguous operating agreement of [the Company], providing for

---

[6] To interpret the clause in the same manner as Appellants, we would be required to insert "for his membership interest" into the clause. "An interpretation that inserts language into a contract is forbidden." ***Nicolazzi***, 564 S.W.3d at 373 (internal citation and quotations omitted). Additionally, Appellants' interpretation of section 7.4 of the operating agreement would lead to an absurdity since it would allow any member for any reason to oust another member and acquire his membership interest in the Company for just 12 payments of $1,000 even though that member would have been entitled to the fair market value of his membership interest if expelled *with cause*. Had the parties intended for a member expelled without cause to be completely divested of his member's interest and for that interest to transfer to the remaining members upon expulsion, the drafters would have included such language.

expulsion of a member without cause pursuant to section 7.4(A), ***required application of other provisions in Article VIII*** of the operating agreement, dealing with dissolution or dissociation events and rights resulting from the same, <u>because</u>, the unambiguous operating agreement of [the Company] ***did not require consideration*** of rights, procedures or remedies under Article VIII of the operating agreement in that the procedures for expulsion without cause do not implicate or require consideration of procedures or remedies provided by reason of a dissolution or dissociation as set forth within Article VIII of the operating agreement.

(Emphasis added, underlined as in original).

Stated more succinctly, Appellants argue the trial court erred in considering Article VIII of the operating agreement because section 7.4(A) did not require the trial court to consider procedures or remedies contained in Article VIII regarding dissolution or dissociation. Appellants' point tells us nothing about the specific way the trial court misapplied any "other provisions in Article VIII" but broadly contends it was an error for the trial court *to even consider* Article VIII at all. For context, Article VIII is a very lengthy provision dealing with liquidation, dissociation events, and dissolution. Without identifying a specific ruling or finding that the trial court made as to Article VIII, it is difficult for us to understand Appellants' argument.[7] Nevertheless, we interpret Appellants' argument to be that it was an error for the trial court to consider Article VIII because the expulsion of a member did not trigger a dissociation event.

---

[7] Because Appellants' point fails to identify the specific way the trial court misapplied Article VIII—other than considering it at all—we could end our analysis there since it is never an error for the trial court to consider a contract as a whole in interpreting a contract. Words or phrases in a contract must be interpreted by the court in the context of the contract as a whole and are not to be considered in isolation. ***Mendota***, 456 S.W.3d at 903. Nevertheless, we indulge Appellants by addressing whether the trial court erred in determining the expulsion of Respondent triggered a "Dissociation Event" under Article VIII. However, we do not consider whether or not the trial court's application of the buy-out default provisions in Article VIII was in error. "An appellate court need not consider issues raised in the argument portion of a brief that are not raised in the point relied on." ***Law Offices of Gary Green, P.C. v. Morrissey***, 210 S.W.3d 421, 426 (Mo. App. S.D. 2006) (quoting ***Alberswerth v. Alberswerth***, 184 S.W.3d 81, 96 (Mo. App. W.D.2006)).

Article VIII, Section 8.1 defines "Dissociation Event" as any event "described in Section 347.123 of the Act occurring with respect to a Member" (other than death of a Member).[8]  Section 347.123(3) includes expulsion of a member in accordance with the operating agreement as an event of withdrawal.  Accordingly, Respondent's expulsion without cause is a "Dissociation Event" under the operating agreement, and it was, therefore, appropriate for the trial court to determine a "Dissociation Event" had occurred.  The trial court did not err in determining that Respondent's expulsion required it to *consider* the provisions of Article VIII.  Point 3 is denied.

### Point 4

In point 4, Appellants argue the trial court erred in determining the Company had a value of $900,000 because such determination was against the weight of the evidence in that "all documentary evidence of economic activity presented, without objection, by both plaintiff's counsel and defendant's counsel, established a net worth of [the Company] for six years preceding the trial that averaged just under $186,000.00[.]" Appellants' argument mistakenly conflates "net worth" with value and ignores the credibility determinations of the trial court.

---

[8] Article VIII section 8.2 reads in pertinent part:

> (A)   No act, thing, occurrence, event, or circumstance shall cause or result in the dissolution of the Company except that the earliest to occur of any of the following events (a "Liquidation Event") shall work an immediate dissolution of the Company:
>
>   . . . .
>
> (3)   Subject to Section 8.2 below, any event (each a "Dissociation Event") other than death of a Member, described in Section 347.123 of the Act occurring with respect to a Member; PROVIDED, HOWEVER, that the Members hereby agree that, upon the occurrence of (a) a Buy-out Default (defined hereafter), or (b) a voluntary withdrawal of a Member in violation of the terms of this Agreement, the business and affairs of the Company shall be automatically continued by the Company and such event shall not constitute a Dissociation Event for purposes of this Agreement. "

11

## Standard of Review

"A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." **Nicolazzi**, 564 S.W.3d at 372 (quoting **S.S.S. v. C.V.S.**, 529 S.W.3d 811, 816 (Mo. banc 2017)). Even if evidence poses two reasonable but different conclusions, this Court must defer to the circuit court's assessment of that evidence. **Interest of C.E.B.**, 565 S.W.3d 207, 217-18 (Mo. App. S.D. 2018). The trial court is in a superior position to assess credibility, therefore, we defer to the factual findings of the trial court. **McGuire**, 496 S.W.3d at 606. Further,

> An against-the-weight-of-the-evidence challenge does not grant an appellant license to ignore such deference and argue witness credibility issues on appeal.[9] Appellants taking such license deprive their argument of any persuasive or analytical value and doom their challenge to defeat, *Ivie [v. Smith],* 439 S.W.3d [189,] 202 [(Mo. banc 2014)].

**In re Marriage of Scrivens**, 489 S.W.3d 361, 367-68 (Mo. App. S.D. 2016).

## Discussion

Appellants argue that because the undisputed business records showed the Company had an average *net worth* of under $186,000, the trial court's determination that the Company had a value of $900,000 was against the weight of the evidence. Appellants argument fails because they make no attempt to explain why a company's "net worth" determines its value.

---

9    The circuit court is able to judge directly not only the demeanor of witnesses, but also their sincerity and character and other trial intangibles that the record may not completely reveal. Accordingly, this standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective.

**In re Marriage of Schubert v. Schubert**, 561 S.W.3d 787, 795-96 (Mo. App. S.D. 2018).

The concepts of value and net worth might be related but they are distinct. "Net worth," as defined by Appellants, is simply the value of the Company's assets minus its liabilities as shown in the business records. In contrast,

> [f]air market value is the price which the property in question would bring when offered for sale by one willing, but not obliged to sell it, and it is bought by one willing to purchase it, but who is not compelled to do so. No one formula or method of determining value is binding or conclusive. . . . Hence, the trial court can accept the opinion of one expert as to the value over another and can prefer one method of valuation over competing methods based on the particular facts of the case and the circumstances of the corporate entity involved.

*Nelson v. Nelson*, 195 S.W.3d 502, 507 (Mo. App. W.D. 2006) (internal citations and quotations omitted). By failing to explain why the trial court was obligated to rely solely on the Company's "net worth" in determining the Company's value, Appellants have failed to present a persuasive argument.

Appellants' argument is doomed for a second reason. Appellants completely ignore our standard of review, which requires us to defer to the credibility determinations of the trial court.[10] The evidence related to the Company's value *was*

---

[10] Appellants also ignore the four-step analytical sequence for presenting an against-the-weight-of-the-evidence challenge. These four steps are:

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;

> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Schubert*, 561 S.W.3d at 796 (quoting *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010)).

contested.[11]  The evidence produced at trial showed the Company had retained earnings of $1,617,661 in 2017 and the Company's total member distributions averaged over $170,000 per year between 2013 and 2017.  Additionally, the Company's total income exceeded $2.5 million between 2013 and 2017.

Respondent testified he believed the Company had a value of approximately $900,000.00.[12]  Appellant Huntoon testified the Company had about $10,000 worth of assets in vehicles and about $70,000 in total assets, but that he "[didn't] think [the Company] was worth anything."[13]  The trial court found Appellants' testimony about the value of the Company "not credible" and Respondent's testimony "more closely supported by the evidence presented."[14]

Given the conflicting testimony regarding the value of the Company, we defer to the trial court's credibility determination.  We cannot say the trial court could not have

---

[11] Neither party offered expert testimony by any third party on the issue of the Company's value. However, Appellants do not challenge Respondent's qualifications for providing such testimony.

[12] For ease of readability, we have created the following table using information from Appellants' Trial Exhibits 2-7 and Respondent's Trial Exhibit 2.

| Year | Total Net Equity of Members | Distributions to Members | Taxable (Ordinary Business Income) | Assets | Liabilities |
|------|------|------|------|------|------|
| 2013 | $213,165.03 | $166,605.00 | $274,572.00 | $373,906.88 | $160,741.85 |
| 2014 | $196,796.78 | $184,260.00 | $122,759.00 | $335,345.27 | $138,548.49 |
| 2015 | $313,643.10 | $187,020.00 | $209,167.00 | $461,456.05 | $147,812.95 |
| 2016 | $183,332.74 | $148,500.00 | $100,970.00 | $300,511.99 | $117,179.25 |
| 2017 | $142,116.22 | $188,425.00 | $127,139.00 | $365, 504.92 | $223,388.70 |

[13] At the time of Respondent's expulsion, the Company had three outstanding loans totaling the sum of $184,564.19.

[14] The trial court made a finding that Appellants' testimony "that in 2018 the Company was worth about $10,000 is not credible."

reasonably found the Company had a fair market value of $900,000 since a former member of the Company testified to that amount. *See S.M.S. v. J.B.S.*, 588 S.W.3d 473, 512 (Mo. App. E.D. 2019) ("[A]lthough the evidence adduced at trial may have posed multiple reasonable, although different conclusions, our standard of review requires us to defer to the trial court's assessment of the evidence and credibility determinations with respect to the contested factual issues regarding the valuations of [company] stock."). Appellants' argument would require us to assume the role of fact-finder and supplant the trial court's credibility determinations with our own. That we cannot do. Point 4 is denied.

### Point 6

In point 6, Appellants claim the trial court erred in determining they failed to establish the affirmative defense of accord and satisfaction because Respondent accepted 12 successive payments of $1,000 and there was written confirmation that he received those payments. Appellants' argument assumes that the 12 payments were made to compensate the expelled-without-cause member for his member's interest. Appellants point us to nothing demonstrating that Respondent accepted the 12 payments in full satisfaction of his member's interest. The letter Respondent received from Appellants merely stated the payments were being made in accordance with section 7.4 of the operating agreement. Neither the letter nor the operating agreement contained language indicating Respondent was waiving, forfeiting, or otherwise divesting himself of his member's interest in the Company by accepting such payments. *See Weltmer v. Signature Health Servs. Inc.*, 417 S.W.3d 856, 865 (Mo. App. E.D. 2014) ("The language of this letter was insufficient to create a contract for

15

an accord and satisfaction, because there was no *express communication* that the payment was intended as satisfaction in full.").  Point 6 is denied.

### *Points 7 and 8*

In their final two points, Appellants claim the trial court erred in assessing punitive damages (point 7) and attorney's fees (point 8) because Respondent can only be awarded punitive damages and attorney's fees if actual damages are properly awarded.  As previously discussed, the trial court did not err in finding in favor of Respondent and awarding him actual damages.  Points 7 and 8 are denied.

### **Conclusion**

The trial court's judgment is affirmed.


MARY W. SHEFFIELD, P.J. – OPINION AUTHOR

GARY W. LYNCH, C.J. – CONCURS

DON E. BURRELL, J. – CONCURS