

# In the Missouri Court of Appeals
# Eastern District
## DIVISION FOUR

| | | |
|---|---|---|
| DENNIS KALLASH, AND TONI KALLASH, | ) ) ) | No. ED111400 |
| Respondents, | ) ) | Appeal from the Circuit Court of Lincoln County |
| vs. | ) | 21L6-CC00056 |
| | ) | |
| NICOLE BRUNER-JONES, | ) | Honorable Patrick S. Flynn |
| | ) | |
| Appellant. | ) | Filed: March 12, 2024 |

Before John P. Torbitzky, P.J., James M. Dowd, J., and Michael S. Wright, J.

## OPINION

In this dispute involving a claim that a homeowner violated the restrictive covenants governing her subdivision, Nicole Bruner-Jones appeals the trial court's decision granting Dennis and Toni Kallash's petition for a permanent injunction requiring Bruner-Jones to remove solar panels from her roof because their installation violated the Casscades of Rockport subdivision's Declaration of Covenants, Conditions, and Restrictions (Declaration) in that she altered her roof without the Kallashes' approval.

Bruner-Jones now appeals asserting that the trial court erred in entering its judgment because: (1) the Kallashes did not submit sufficient evidence that irreparable harm would occur in the absence of an injunction and (2) the Kallashes lacked standing since they no longer owned

any lots within the Casscades and therefore were no longer the owners or trustees entitled under the Declaration to enforce the restrictive covenant at issue.

We reverse based on Bruner-Jones's standing argument because, under the language of the Casscades' Declaration, the Kallashes were no longer the trustees of the Casscades subdivision at the time they filed their petition for injunction and therefore had no authority with respect to the enforcement of the Declaration and no standing to bring this case.

## Background

The Kallashes developed Rockport, a platted development with 202 residential lots in Lincoln County, Missouri, which comprised of five subdivisions including the Casscades where Bruner-Jones resides. The other subdivisions are Rockport, First Addition to Rockport Plat I, Second Addition to Rockport Plat I, and Third Addition to Rockport Plat I. Each subdivision is governed by its own unique Declaration of Covenants, Conditions, and Restrictions which the Kallashes recorded at different times.

The Kallashes executed the Casscades' Declaration on August 3, 2017. It provides that construction plans must be approved by the "Owners/Developers/Trustees,'' before any building may be erected or altered on any residential lot and that no additions may be made to the original structure without the Owners/Developers/Trustees' approval in writing. Moreover, Paragraph 12.2 states that the Owner/Developer/Trustee shall have the right to reject plans, construction, and quality of materials that do not meet the Owners/Developers/Trustees' requirements. Dennis Kallash testified that he rejected Bruner-Jones's solar panel project on the basis of this language.

The Declaration further states that, "Until all Lots are sold by the Owner/Developer in all phases and additions, the Board of Trustees shall consist of the Owner/Developer." It also sets forth the procedure to be followed after all lots are sold in all phases and additions. Under that

2

procedure, the existing Board of Trustees (the Kallashes) was required to set a meeting of existing "Lot owners" at a convenient place within the subdivision on the first Saturday in June to elect new Trustees.[1]  Furthermore, the Declaration prescribes that "[t]he trustees shall have the power and authority to prevent, in their own names as Trustees, violation of any express trust, any infringement, and compel the performance of any restriction" and that they may "employ counsel and institute and prosecute such suits as they deem necessary and advisable and defend suits brought against them individual or collectively, in their capacity as Trustees."

In 2019, the Kallashes sold Lot 184, otherwise known as 433 Cass Drive, to Cannon Real Estate.  Bruner-Jones then purchased Lot 184 from Cannon.  In July or August 2019, Bruner-Jones inquired about installing solar panels on her roof.  On October 23, 2019, she submitted to the Kallashes an application for approval to do so and on October 30, 2019, she spoke with Dennis Kallash about her request.  Kallash testified that he denied her request during their October 30 conversation although Bruner-Jones disputed that he expressed any position on her request during that conversation.  In January 2020, Bruner-Jones installed the solar panels on her roof.  The Kallashes stipulated at the time of trial that they no longer owned any lots within the Casscades.

On June 5, 2020, the Kallashes' attorney notified Bruner-Jones by letter that the solar panels violated the Casscades' Declaration and directed her to remove them which she did not do.  On May 12, 2021, the Kallashes filed their petition for injunction to remove the solar panels because they violated the Casscades' Declaration that construction plans must be approved by the "Owners/Developers/Trustees" before "any building shall be erected, placed, or altered on

---

[1] The Kallashes did not schedule this meeting as required after all the lots in the Casscades were sold.

any residential lot ..." and the Kallashes had rejected her proposal to do so. After a bench trial on August 26, 2022, the court held that as trustees, the Kallashes had the sole right to approve or reject construction of structures in the Casscades, that the Kallashes rejected Bruner-Jones's request, and that Bruner-Jones violated the Declaration by installing the solar panels, the removal of which the court ordered.

This appeal follows.

## Standard of Review

"On appeal of a bench-tried case, the 'judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.'" *Lin v. Clark*, 666 S.W.3d 270, 277 (Mo. App. W.D. 2023) (quoting *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). Because a restrictive covenant is a private contractual obligation, construing a restrictive covenant presents a question of law that we review *de novo*. *Wildflower Community Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000).

## Discussion

In her second point, which we find to be dispositive of this appeal, Bruner-Jones claims that the trial court lacked authority to grant the injunction because at the time the petition was filed the Kallashes were no longer the trustees of the Casscades subdivision and therefore had no standing to bring this action.[2] We agree.

---

[2] Bruner-Jones couched her argument in terms of subject-matter jurisdiction, which is contrary to the now-familiar principle from *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 253 (Mo. banc 2009) that subject-matter jurisdiction is rarely at issue since "[t]he circuit courts shall have original jurisdiction over all cases and matters, civil and criminal." Article V, section 14 of the Missouri Constitution; section 478.070. Whether a party has standing to sue implicates the trial court's *authority* to reach a determination on the merits, not jurisdiction. *Eaton v. Doe*, 563 S.W.3d 745, 747 (Mo. App. E.D. 2018).

"Reduced to its essence, 'standing' roughly means that the parties seeking relief must have some personal interest at stake in the dispute, even if that interest is attenuated, slight or remote; this personal stake is shown by alleging a threatened or actual injury resulting from the challenged action." *Crumbaker v. Zadow*, 151 S.W.3d 94, 96 (Mo. App. E.D. 2004). "To establish standing, a party seeking judicial relief with respect to property must show they have a valid, legally protectable interest in the property at issue so as to be directly and adversely affected by the outcome of any litigation regarding the property." *Bray v. Lee*, 620 S.W.3d 278, 282 (Mo. App. E.D. 2021). "In cases seeking injunctive relief, the question of standing 'obviously shade[s] into [a] determin[ation] whether the complaint states a sound basis for equitable relief.'" *Eaton*, 563 S.W.3d at 747 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)).

"An association has standing to assert a cause of action on behalf of its members if: (1) its members would otherwise have standing to bring suit in their own right, (2) the interest it seeks to protect is germane to the organization's purpose; and (3) neither the claim nor the relief requested requires the participation of individual members in the lawsuit." *Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157, 171 (Mo. App. E.D. 1998).

So, the question becomes whether, under the terms of the Declaration, the Kallashes had standing to bring this action. "A restrictive covenant is a private contractual obligation generally governed by the same rules of construction applicable to any covenant or contract." *Wildflower Community Ass'n, Inc.*, 25 S.W.3d at 534. Our goal is to ascertain the intent of the parties and give effect to that intent. *Id.* The intention of the parties is determined from the plain meaning of the language used, taken in light of the entire context of the instrument. *York v. Authorized Investor Group, Inc.*, 931 S.W.2d 882, 887 (Mo. App. E.D. 1996).

Moreover, "restrictive covenants are narrowly construed and are not extended by implication to include anything not clearly expressed in them." *Lake Saint Louis Community Ass'n v. Ravenwood Properties, Ltd.*, 746 S.W.2d 642, 644 (Mo. App. E.D. 1988). "If there is substantial doubt of their meaning, such doubt should be resolved against the restriction and in favor of the free use of property." *Id.* (citing *Blevins v. Barry-Lawrence County Association*, 707 S.W.2d 407, 408 (Mo. banc 1986)). However, this principle should not be applied in a manner that would defeat the plain and obvious purpose and intent of the restriction. *Id.*

After carefully reviewing the Casscades' Declaration and applying the foregoing rules of construction, we find that the Declaration *only* applies to the Casscades, and not to the Rockport development generally, which is fatal to the Kallashes' argument here. First, the title of the document limits itself to the "Casscades of Rockport" and the legal description attached to the Declaration describes the Casscades, not the whole Rockport development. Moreover, the document makes no reference whatsoever to the Casscades being part of the larger Rockport development. This Declaration was the only one attached to Bruner-Jones's property and recorded in the county records, and was the only Declaration that Bruner-Jones signed. Any other declaration applicable to the other plats of Rockport is not relevant to her property or to this appeal because her property was not subject to them.

We next turn to paragraph 27(a) of the Declaration from which we conclude that the Kallashes lost their standing to bring an action for injunction when they sold their last lot in the Casscades which terminated their term as the trustees. Paragraph 27(a) provides that "[u]ntil all Lots are sold by the Owner/Developer in all phases and additions, the Board of Trustees shall consist of the Owner/Developer." It also provides that "[t]he Trustees, in exercising rights, powers, and privileges granted to them … may … employ counsel and institute and prosecute

6

such suits as they deem necessary and advisable and defend suits brought against them individual or collectively, in their capacity as Trustees." Therefore, applying the plain, ordinary, and usual meaning of this language, after the Kallashes sold their last lot in the Casscades, they were no longer the trustees of the Casscades and did not have standing to seek an injunction. *Kauffman v. Roling*, 851 S.W.2d 789 (Mo. App. W.D. 1993) ("If the meaning of terms in a restrictive covenant is questioned, absent any indication that a 'special meaning' for a particular word is intended, this court gives the language used its plain, ordinary, and usual meaning.").

For their part, the Kallashes rely on Paragraph 27(a) to argue that Rockport was a single subdivision and that they remained the Board of Trustees over all five subdivisions until all lots in all five plats were sold because the "phases and additions" phrase referred to the other plats in Rockport. The Kallashes further argue that Rockport was a single entity that was being built in phases which is reflected by the different plats of the subdivision. They cite to *Newmark v. L & R Dev. Corp.*, 615 S.W.2d 118, 120 (Mo. App. E.D. 1981) to support their contention that when the provisions reflect the clear intent of the covenantors to provide for a common development of the plats as a single entity, it will be enforced. In *Newmark*, however, the language in the sub-indenture undeniably established that the subdivision was part of a larger entity. *Id.* For example, it stated that "Party of the First Part now desires to proceed with the development of its property *lying within said Village of Green Trails Subdivision* … by filing … a plat entitled Ladue Trails Section of the Village of Green Trails Plat 1." *Id.* (Emphasis added).

Here, the Kallashes' own document, the Casscades' Declaration, that they recorded in Lincoln County, undermines their position. The Declaration is limited by its own terms to the Casscades only and does not, under any fair reading, make a property owner who executes that document somehow subject to or part of a larger project. Yet, for this argument, the Kallashes

7

ineffectively rely on evidence and testimony outside of the four corners of the document, including the other plats' declarations and on Dennis Kallash's testimony that Rockport was a single subdivision with common sewer and water service maintenance and roads and streets. "Where the parties have expressed their final agreement in writing and no ambiguity exists, the court determines the intent of the parties and the contract's clear meaning solely from the four corners of the contract itself." *Patterson v. Rough Road Rescue, Inc.*, 529 S.W.3d 887, 893-94 (Mo. App. E.D. 2017).

Therefore, the Kallashes lacked standing and the court did not have authority to grant the petition.[3]

## Conclusion

For the reasons set forth above, we reverse the trial court's judgment.

_____
James M. Dowd, Judge

John P. Torbitzky, P.J. and
Michael S. Wright, J. concur.

---

[3] In Point I, Bruner-Jones asserts that the trial court erred in finding in favor of the Kallashes because they did not plead nor submit sufficient evidence that they were going to suffer an irreparable harm without the injunction. In light of our holding that the court did not have authority to render a judgment, we need not address this point.